UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| 21ST CENTURY CENTENNIAL INSURANCE COMPANY, *et al.*, | Case No. 6:24-cv-00089-MTK (Lead Case) |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, *et al.*, | |
| Defendants, | |
| ROBERT ADAMS, *et al.*, | Case No. 6:24-cv-00092-MTK (Trailing Case) |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, *et al.*, | |
| Defendants, | |
| KEVIN ALLARD, *et al.*, | Case No. 6:24-cv-00203-MTK (Trailing Case) |
| Plaintiffs, | |
| v. | |
| UNITED STATES, *et al.*, | |
| Defendants, | |
| GIUSTINA LAND & TIMBER CO., LLC, *et al.* | Case No. 6:24-cv-01152-MTK (Trailing case) |
| Plaintiffs, | |
| v. | |
| EUGENE WATER & ELECTRIC BOARD, *et al.*, | |
| Defendants, | |

Page 1 — OPINION AND ORDER

TRACI ENFIELD, *et al.*,

      Plaintiffs,

    v.

UNITED STATES, *et al.*,

      Defendants.

Case No. 6:25-cv-00554-MTK **(**Trailing case)

**OPINION AND ORDER**

**KASUBHAI,** United States District Judge:

Defendant United States of America moves to dismiss all claims against it for lack of

subject matter jurisdiction. ECF Nos. 84, 116; *Enfield v. United States*, No. 6:25-cv-00554-

MTK, ECF No. 17. For the reasons explained below, Defendant United States' motions are

DENIED in part and GRANTED in part.

## BACKGROUND

### I.    The Fire

On September 4, 2020, the National Weather Service forecasted strong winds with gusts

over fifty miles per hour which, combined with existing dry conditions and low humidity, led to

a fire weather watch in Lane County for the next several days. *See* Curtis Aff. Supp. Pls.' Resp.

Mot. Dismiss ("Curtis Aff.") Ex. A ("USFS Report") 1, 1129-31, ECF No. 161-1. On September

7, 2020, two wildfires started along Oregon Highway 126. USFS Report 1. The two fires merged

to form the Holiday Farm Fire. USFS Report 1. The Holiday Farm Fire burned over 170,000

acres, destroyed over 700 structures, and killed one person. Curtis Aff. Ex. P "ODF Summary" 3,

ECF No. 161-16.

The United States Forest Service investigated and reported the cause of the fire. USFS

Report 1. The first ignition took place near McKenzie Bridge after a tree fell on a de-energized

Eugene Water and Electric Board ("EWEB") power line and pushed it into an energized Lane

Electric Cooperative, Inc. ("LEC") power line, energizing the entire EWEB line. USFS Report 1; Curtis Aff. Ex. O ("Origin Report") 135-36, ECF No. 161-15. Six miles to the west, near milepost 41 of Oregon Highway 126, a tree fell on a Bonneville Power Administration ("BPA") power line, the Cougar-Holden line, pushing it into ground vegetation. USFS Report 1; Origin Report 14, 136. Once the EWEB line was energized, it carried the electricity to the fallen BPA line, igniting the combustible ground vegetation and causing substantial fire damage and loss of life and property in the surrounding communities. Origin Report 136; USFS Report 30; ODF Summary 3.

## II.     The Parties

Those harmed by the fire filed multiple lawsuits, now consolidated before the Court, in four groups (collectively, Plaintiffs"). *See* ECF Nos. 62, 185 (consolidating cases). Three of these groups, the "Allard Plaintiffs," the "Adams Plaintiffs," and the "Enfield Plaintiffs," are comprised directly of residents, representatives, and legal entities harmed by the fire.[1] A fourth group of plaintiffs, the "Subrogation Plaintiffs," is made up of insurance companies that paid policy claims to their insureds for losses resulting from the fire. Subr. FAC ¶¶ 7, 54.

Plaintiffs bring tort claims[2] against three electrical utilities which do business in Oregon. Defendant United States operates BPA as a federal agency under the Department of Energy. Adams SAC 190-91; Allard FAC 22-30; Enfield Compl. 19-25; Subr. FAC 20-21. BPA

---

[1] First Am. Compl. ("Allard FAC"), *Allard v. United States*, No. 6:24-cv-00203-MTK, ECF No. 47; Second Am. Compl. ("Adams SAC") ECF No. 115; First Am. Compl. ("Subr. FAC") ECF No. 67; Compl. ("Enfield Compl."), *Enfield v. United States*, No. 6:25-cv-00554-MTK, ECF No. 1.

[2] The Adams Plaintiffs allege negligence, gross negligence, and trespass. Adams SAC 190-91, 194, 199-200; The Allard Plaintiffs allege negligence, negligence per se, trespass, and nuisance. Allard FAC 22-30. The Enfield Plaintiffs allege negligence, trespass, and nuisance. Enfield Compl. 19-25. The Subrogation Plaintiffs allege negligence. Subr. FAC 20-21.

transmits electricity to local utility providers throughout the Pacific Northwest. *E.g.*, Subr. FAC ¶ 18; Allard FAC ¶ 13. Defendant EWEB and Defendant LEC sell electricity to local customers, which includes electricity purchased from BPA. *E.g.*, Subr. FAC ¶ 17; Allard FAC ¶¶ 14-15. Defendants EWEB and LEC bring crossclaims against the United States.[3]

## III.    Claims Against the United States

Underlying the claims against the United States is at least one of two allegations central to the instant motion: The United States, through BPA, caused the Holiday Farm Fire by failing to (1) remove a hazardous tree adjacent to its power lines and (2) appropriately operate its power lines.[4] The United States moves to dismiss all claims against it for lack of subject matter jurisdiction. The United States argues specifically that its conduct is protected by the discretionary function exception to the Federal Tort Claims Act.

Following the United States' motions, the Court allowed jurisdictional discovery. ECF Nos. 124, 121, 93. Thereafter, the Court consolidated *Enfield v. United States*, No. 6:25-cv-00554-MTK, with the leading case for purposes of pretrial motions and discovery. Order, ECF No. 185. The Court now considers whether the United States is immune from all the claims alleged by the Subrogation Plaintiffs, the Adams Plaintiffs, the Allard Plaintiffs, Defendant EWEB, Defendant LEC, and the Enfield Plaintiffs (collectively, "Non-Movants").

---

[3] EWEB alleges contributory negligence and contribution. Def. Eugene Water and Electric Board's Ans., Affirmative Defenses, and Cross-cls. ("EWEB Cross-cls.") 18-20, ECF No. 73. LEC alleges contribution. Def. Lane Electric Cooperative, Inc.'s Ans., Affirmative Defenses, and Cross-cl. ("LEC Cross-cl.") 13-14, ECF No. 74.

[4] *E.g.*, Subr. FAC ¶¶ 49-55 (tree); Adams SAC ¶ 1680 (power lines and tree); Allard FAC ¶¶ 55 (power lines and tree); Enfield Compl. ¶ 57 (power lines and tree); EWEB Cross-cls. ¶109; Def. Eugene Water and Electric Board's Joinder Certain Non-United States Parties Resps. United States' Mot. Dismiss ECF No. 157 (tree); LEC Cross-Cl. 13-14 (tree).

**STANDARDS**

Federal courts are courts of limited jurisdiction. *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quotation marks and citation omitted). As such, a court is to presume "that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted); *see also Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1256 (2022). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). An objection that a particular court lacks subject matter jurisdiction may be raised by any party, or by the court on its own initiative, at any time. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); Fed. R. Civ. P. 12(b)(1). The Court must dismiss any case over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3); *see also Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015) (noting that when a court lacks subject-matter jurisdiction, meaning it lacks the statutory or constitutional power to adjudicate a case, the court must dismiss the complaint, even *sua sponte* if necessary).

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may be either "facial" or "factual." *See Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016). A facial attack on subject matter jurisdiction is based on the assertion that the allegations contained in the complaint are insufficient to invoke federal jurisdiction. *Id.* "A jurisdictional challenge is factual where the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Pride v. Correa*, 719 F.3d 1130, 1133 n.6 (9th Cir. 2013). A factual attack on the plaintiff's assertion of jurisdiction "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 614 (9th Cir. 2016); *see also Terenkian v. Republic of Iraq*, 694 F.3d 1122,

1131 (9th Cir. 2012). A factual challenge "can attack the substance of a complaint's

jurisdictional allegations despite their formal sufficiency." *Dreier v. United States*, 106 F.3d 844,

847 (9th Cir. 1996) (citation and quotation marks omitted).

## DISCUSSION

I.      **The Discretionary Function Exception**

As a sovereign, the United States is immune from suit unless Congress has unequivocally

waived that immunity. *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1087-88 (9th Cir.

2007). The Federal Tort Claims Act ("FTCA") waives sovereign immunity for injury "caused by

the negligent or wrongful act or omission of any employee of the government while acting

within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). "[T]he FTCA was

created by Congress with the intent 'to compensate individuals harmed by government

negligence,' and as a 'remedial statute,' it 'should be construed liberally, and its exceptions

should be read narrowly.'" *Terbush v. United States*, 516 F.3d 1125, 1135 (9th Cir. 2008)

(quoting *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002)).

The FTCA's waiver does not extend, however, to "the exercise or performance or the

failure to exercise or perform a discretionary function or duty on the part of a federal agency or

an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. §

2680(a). This limitation, known as the discretionary function exception, "marks the boundary

between Congress' willingness to impose tort liability upon the United States and its desire to

protect certain governmental activities from exposure to suit by private individuals." *Berkovitz v.

United States*, 486 U.S. 531, 536 (1988) (quoting *United States v. Varig Airlines*, 467 U.S. 797,

808 (1984)).

A.     The *Berkovitz* Test

Courts use a two-part test to determine whether the exception applies. *Berkovitz*, 486 U.S. at 536. The government bears the burden to show conduct falls within the exception. *Chang v. United States*, 139 F.4th 1087, 1093 (9th Cir. 2025).

 First, the conduct in question must "involv[e] an element of judgment or choice." *Berkovitz*, 486 U.S. at 536. In making this inquiry, the court focuses on "the nature of the conduct, rather than the status of the actor," meaning discretionary conduct is not limited to the planning level. *United States v. Gaubert*, 499 U.S. 315, 325 (1991) (citation omitted); *Chang*, 139 F.4th at 1095 (explaining that implementing a government design is discretionary "when '[t]he implementation itself implicates policy concerns.'") (citation omitted). The exception does not apply "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Lam v. United States*, 979 F.3d 665, 674 (9th Cir. 2020) ("If the policy is mandatory, it cannot be discretionary.").

Second, the judgment involved must be "based on considerations of public policy." *Gaubert*, 499 U.S. 323 (quoting *Berkovitz*, 486 U.S. at 537). Not every act involving judgment is protected because the discretionary function exception "is not so broad that it would overtake the very waiver of sovereign immunity from which it cuts back." *Chang*, 139 F.4th at 1093. For example, driving a vehicle may require government officials to make judgments such as how fast to drive or how soon to brake, but those judgments are not grounded in public policy. *See Gaubert*, 499 U.S. at 325 n.7. The discretionary function exception "prevent[s] judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Gaubert*, 499 U.S. at 323 (quoting *Varig Airlines*, 467 U.S. at 814). For example, the discretionary function exception shielded from liability the Federal Aviation Administration's design and implementation of a "spot-check" plan

to inspect airplanes because the conduct was grounded in the agency's objective to maintain air transportation safety. *Varig Airlines*, 467 U.S. at 816, 819-20.

The inquiry focuses "not on the agent's subjective intent . . . but on the nature of the actions taken and on whether they are *susceptible* to policy analysis." *Lam*, 979 F.3d at 674 (quoting *Gaubert*, 499 U.S. at 325). The conduct is presumptively grounded in public policy where the agent acts with discretion. *Id.* At the motion to dismiss stage, a plaintiff "must 'allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be *grounded* in the policy of the regulatory regime.'" *Terbush*, 516 F.3d at 1130 (quoting *Gaubert*, 499 U.S. at 324-25).

### B.    Relevant Cases

Several Ninth Circuit cases analyze the discretionary function exception in the context of the government's failure to manage hazards associated with its land. *E.g.*, *Kim v. United States*, 940 F.3d 484, 486 (9th Cir. 2019) (failure to evaluate and respond to tree hazards in Yosemite National Park); *Lam*, 979 F.3d at 670 (failure to remove a tree in a Lake Mendocino recreation area campground); *Chang*, 139 F.4th at 1090 (failure to maintain a lawn in a national park in the Northern Mariana Islands). These cases inform the Court's analysis.

The discretionary function exception does not protect technical and professional judgments made in the absence of policy considerations. *Kim*, 940 F.3d at 489. In *Kim*, a tree limb fell on a tent in a Yosemite campground, killing two people. *Id.* at 486. The plaintiffs alleged that park officials failed to identify and mitigate the risk posed by the tree. *Id.* at 487. The government argued that park officials' decision to mitigate the risk posed by the tree was protected by the discretionary function exception. *Id.* at 488, 491. Park officials used a seven-point system to assign each tree a "'Total Hazard Rating' (ranging from two to seven) that combine[d] a 'Defect Rating' based on the tree's potential for physical failure and a 'Target

Rating' based on the potential impact in the event of a failure." *Id.* at 488. A tree's "visible decay and damage" like "dead limbs, rot, or fungus" determined its Defect Rating. *Id.* at 489 n.2. A tree's "proximity to . . . campgrounds, lodges, residences, trails, roads, and picnic areas" determined its Target Rating. *Id.* A tree with a Total Hazard Rating of five or higher "require[d] some type of abatement/mitigation." *Id.* at 488. Although experts disputed the rating of the tree in question, the discretionary function did not apply because the seven-point system only allowed officials leeway to use technical expertise to evaluate tree risk considering "variations in [tree] species and environmental factors" and not any public policy considerations. *Id.* at 489-90.

The discretionary function exception protects conduct made under a policy that requires a government employee to weigh competing policy goals. *Lam*, 979 F.3d at 680-81. The *Lam* plaintiff was struck by a falling tree while he slept at a campground in a Lake Mendocino recreation area. *Id.* at 670. He alleged that the officials who managed the recreation area negligently failed to remove the tree. *Id.* Officials were required to manage the recreation area according to an operational management plan. *Id.* at 678-79. The plan, however, only provided "guiding objectives" such as maintaining wildlife habitat and "general requirements" for tree management like daily inspections in developed areas. *Id.* at 679. The plan did not contain specific criteria for inspecting the trees. *Id.* at 680. The plan further identified specific policy considerations to balance in managing the recreation area like maximizing recreational experiences, protecting natural resources, and preserving aesthetics. *Id.* at 681. Because officials had to weigh competing policy concerns, they exercised discretion grounded in public policy, and the discretionary function exception applied. *Id.* at 682.

Whether government conduct implicates public policy concerns may be analyzed along a spectrum. *Chang*, 139 F.4th at 1094. The discretionary function exception does not apply on one

end of the spectrum, where "decisions [are] totally divorced from the sphere of policy analysis." *Id.* (quoting *O'Toole*, 295 F.3d at 1035). On the other end of the spectrum, the discretionary function exception protects decisions "fully grounded in regulatory policy." *Id.* (quoting *O'Toole*, 295 F.3d at 1035). In *Chang*, the plaintiff injured his ankle falling into a hole in a lawn maintained by the National Park Service. *Id.* at 1091-92. He alleged that the park service negligently failed to repair the hole. *Id.* at 1092. The discretionary function exception did not apply because repairing the hole was a "very standard form of property maintenance" as opposed to a decision requiring officials to weigh policy considerations like wildlife and habitat preservation. *Id.* at 1097-98.

## II.    Application

Courts examine each "specific allegation[] of agency wrongdoing" because "determining the precise action the government took or failed to take" is critical to the discretionary function exception inquiry. *Young v. United States*, 769 F.3d 1047, 1053 (9th Cir. 2014) (citation omitted). Non-Movants present two specific allegations relevant here: BPA failed to (1) remove a hazardous tree at risk of falling on its lines and (2) properly operate its power lines.

### A.    Danger Tree

The Non-Movants allege that BPA failed to prevent a tree from falling on its power lines.[5] The United States argues that BPA has discretion to identify and remove these types of trees.

---

[5] The complaints and cross-claims do not all appear to identify the same tree. *Compare* LEC Cross-cls. 13-14 (alleging failure to remove a Western Hemlock) *with* Allard Pls.' Resp. Def. United States' Mot. Dismiss 26, ECF No. 159 (referring to a fir tree).

1.    <u>Identifying a Danger Tree</u>

BPA crews must inspect lines under 120 kV, like the Cougar-Holden line, every three years, in conjunction with BPA's maintenance cycle, for danger trees. Curtis Aff. Ex. Y "Sheppard Dep." 71:9-72:7, ECF No. 161-25; Sheppard Decl. ¶ 5, ECF No. 87. Generally, a danger tree is "[a]ny tree located outside of the [right of way] which is a present or future hazard to the transmission line." Sheppard Dep. 52:7-10; Sheppard Decl. Ex. B ("TLM-STD-7-2-1") at 3, ECF No. 87-2. Danger trees can be categorized in several ways. *E.g.*, TLM-STD-7-2-1 §§ 4.3.1 (Fall-Into Danger Tree), 4.3.2 (Bend-Into Danger Tree), 4.3.3 (Swing-Into Danger Tree), 4.3.4 (Grow-Into Danger Tree). Fall-Into Danger Trees are relevant here.

BPA's written policy, TLM-STD-7-2-1, defines a Fall-Into Danger Tree as follows:

**4.3.1    Fall-Into Danger Tree (DT)**

1)    <u>Characteristics</u>: Fall-into Danger Trees are unstable, with a 50 percent or greater probability of structural failure within five years. Structural failure may be due to physical damage or environmental conditions.

- Physical damage includes, but are [*sic*] not limited to fire, fork tops, multi-stems, declining vigor, snow damage and root rot.

- Environmental conditions include but are not limited to tree fringes left from logging, erosion from recent storms, mass-wasting, flooded or saturated ground and slides or evidence of unstable ground.

2)    <u>Identification</u>: Identification of a fall-into danger trees [*sic*] is based on;

- Its instability characteristics.

- If it were to fall, it could violate the clearance threshold distances for Danger Trees as identified in Table 4.1 and as shown in Figure 4.1.

    . . . .



**Figure 4.1   Example of Danger Tree "Fall-Into".**

TLM-STD-7-2-1 § 4.3.1.

TLM-STD-7-2-1 further establishes the clearance thresholds for danger trees which are

calculated using the Minimum Vegetation Clearance Distance ("MVCD"), defined as the

"minimum distance between conductors and vegetation to prevent flash-over between [them]":

| Table 4.1 Danger Brush, Cycle Maintenance and Danger Tree Clearance Thresholds at all operating conditions | | | | |
|---|---|---|---|---|
| Voltage | Imminent Threat (As Observed) | Danger Trees (DT) | Danger Brush (DB & DTG) | Cycle Maintenance (CM) |
| 200 kV & above | MVCD+5 ft. | MVCD+5 ft. | Less than 15 feet | 15-20 feet |
| below 200 kV | MVCD+5ft. | MVCD+5 ft. | Less than 10 feet | 10-15 feet |
| Fiber optic | N/A | N/A | Less than 3 feet | 3-10 feet |

TLM-STD-7-2-1 at 3, 11.

The policies make clear that a Danger Tree is identified when it (1) is fifty percent or more likely to fall within the next five years and (2) would fall within the specified minimum distance of BPA equipment. The first determination requires BPA patrol crews to exercise their professional judgment to evaluate the environmental conditions and physical characteristics of the tree. Sheppard Dep. 80:2-20. The second determination is a mathematical calculation: BPA officials or contractors determine whether a tree would fall inside "a specific distance that needs to be maintained." Sheppard Dep. 83:23-84:7, 86:7-21, 92:12-93:1. That distance is five feet, plus the MVCD, on the Cougar-Holden Line. *See* Sheppard Decl. ¶ 5 (stating that the Cougar-Holden Line is a 115 kV transmission line). The MVCD is a fixed value. *See* Sheppard Dep. 48:5-18; 59:2-3. The second determination is therefore mandatory; BPA crews do not exercise any element of judgment in calculating the minimum threshold clearances for trees. BPA crews do, however, exercise judgment in determining whether a tree's characteristics and its environment indicate whether it is fifty percent or more likely to fall within the next five years.

BPA crews must rely on their professional judgment to assess the environmental and physical condition of the tree under TLM-7-2-1. The park officials in *Kim*, similarly, used their technical expertise to assess whether a tree's physical attributes and its environment reached the threshold for abatement or removal under the seven-point system. But neither do the BPA crews here, nor did the park officials in *Kim*, employ any public policy considerations to arrive at their respective conclusions. *See* Sheppard Dep. 78:21-79:24 (BPA crews only apply the policy language and not their own political, economic, or social views when assessing a tree's potential to fall).

The United States argues that the policy language in *Kim* is more specific than BPA's TLM-7-2-1 because the *Kim* language required officials to assign certain point ratings for certain

factors and to mitigate the danger of the tree if the points exceeded certain values. The

distinction, here, sees the forest for trees. BPA's policy language in this case identifies the

relevant factors and supplies a threshold value for identification of a danger tree. *See* Sheppard

Dep. 75:8-16 (affirming that crews are required to determine whether a tree is fifty percent or

more likely to fall). Whether that threshold is expressed in points or percentage points, it does

not involve public policy judgments.

Although conduct is presumptively grounded in public policy considerations when a

government official acts with discretion, BPA crews do not consider any criteria outside of the

environmental and physical characteristics in § 4.3.1 to identify a danger tree. Sheppard Dep.

78:21-79:4. The record and the explicit terms of TLM-7-2-1 here do not support a finding that

BPA weighs any competing public policy objectives in assessing a tree's likelihood to fall. *Cf.*

*Lam*, 979 F.3d at 681 (citing competing aims of maximizing recreation, protecting resources, and

preserving aesthetics). The identification of danger trees is not susceptible to public policy

considerations, and the discretionary function exception does not protect a failure to identify a

danger tree.

2.     Removing a Danger Tree

The United States also argues that BPA officials perform a discretionary function in

removing a fall-into danger tree. The relevant policies begin with BPA's Transmission Line

Maintenance Performance Level Guides, which designate responsibility for danger tree removal

to the Natural Resource Specialist (NRS):

> **3.14   Danger Tree (S)**
>
> Program all activities based on inspection during helicopter and working
> patrol. Program trees for removal are based on the criteria in the TLM
> Standards and Guides. TLM only responds to imminent hazard vegetation
> found during working patrol. All other trees and brush **<u>shall</u>** be the
> responsibility of the NRS for removal.

> When new lines are to be constructed adjacent to an existing line needing danger tree removal, this work should be scheduled to coincide with the new clearing activities. Program for one fiscal year only i.e., the year the removal is to be done. Do not include or estimate Real Property Services resources costs for cruising, marking, and acquisition.

Curtis Aff. Ex. T 8-9, ECF No. 161-20; *see also* Sheppard Dep. 50:1-13 (defining NRS). BPA

policy further sets a timeline for removal of fall-into danger trees:

**4.7.2    Removal Response Time (S)**

Follow the removal response times listed below.

. . . .

3) <u>Cycle Maintenance Reporting During All Patrols</u>

- Cycle maintenance requires mitigation by May 31 of the following calendar year. (<u>Example</u>: Discovered April 2016 will be mitigated by May 31, 2017)

. . . .

5) For Bend Into, Fall Into, and Swing Into Danger Trees During all Patrols the NRS shall review danger tree reports and will schedule field evaluations.

- Allow adequate time for Valuation and Forestry to research landowner easements and agreements.

  o Acquisition of cutting rights may be required before Danger Trees can be cut.

  o Where Danger Tree rights have already been acquired according to easement documents, Danger Trees may be removed during the current fiscal year.

- NRS compiles a Danger Tree list and submits it annually to Valuation and Forestry.

  o Valuation and Forestry notifies the NRS of the Notice of Rights Secured (NORS).

  o NRS schedules removal during the next fiscal year's vegetation clearing program or earlier as schedule and budget allow.

TLM-STD-7-2-1 § 4.7.2. The "**(S)**" mark before each policy indicates that "[it is] required. [It]

[s]hall be done." Sheppard Dep. 117:22-25.

The United States argues that the removal policy is discretionary because it requires officials to clear legal rights through BPA's Valuation and Forestry department. The policy's terms, however, are described in mandatory language: "[C]ycle maintenance *requires* mitigation by May 31 of the following year." The policy's language only directs officials to report the Danger Tree to allow enough time for legal rights to be cleared to "schedule[] removal during the next fiscal year's vegetation clearing program."

The United States does not dispute that the U.S. Forest Service owned land on which the alleged danger tree stood. United States First. Am. Reply Supp. Mot. Dismiss 18, ECF No. 165. BPA's Memorandum of Understanding with the Forest Service shows that the Forest Service consults with BPA as to *when* to cut danger trees on Forest Service land. Sheppard Dep. 52:14-53:17; Curtis Aff. Ex. S 12, ECF No. 161-19 ("[T]he Forest Service, in consultation with [BPA], may revise the timing during the scheduled year of *routine cycle vegetation maintenance* on a case-specific basis as needed to minimize adverse environmental effects.") (emphasis added). The *Forest Service* may need to consider impacts to endangered species and sensitive habitat prior to a danger tree's removal and has occasionally denied a request from BPA to cut a danger tree on forest service land. Sheppard Dep. 97:9-98:17. That fact, however, does not mean that *BPA* may claim it also considers endangered species and sensitive habitat, particularly where those factors do not appear in the language of BPA's policies. The government may not "merely . . . [wave] the flag of policy as a cover for anything and everything it does." *Terbush*, 516 F.3d at 1134. BPA's danger tree removal policies also do not establish discretion grounded in public policy by referencing budgetary limits. "In enacting § 2680, . . . Congress did not intend to protect decision-making based on budgetary constraints." *Bolt v. United States*, 509 F.3d 1028, 1034 (9th Cir. 2007).

Appropriately framed, danger tree removal, like the lawn maintenance in *Chang*, is more like standard property maintenance than it is any consideration grounded in public policy. TLM-7-2-1 and BPA's agreements repeatedly refer to danger tree removal as routine and cyclical maintenance. BPA's own public statements[6] underscore that the removal of danger trees is neither discretionary nor grounded in public policy. In a July 2016 publication, BPA states

> BPA also *routinely* surveys areas . . . to watch for "danger trees," large trees that may fall over on power lines . . . . When [natural resources specialists] determine that trees in or adjacent to the right-of-way are a current or future hazard to the transmission line, those trees *will* be removed.

Curtis Aff. Ex. V at 3, ECF No. 161-22 (emphasis added). A February 2011 publication similarly states "BPA *must* identify and arrange to cut trees that, although outside the rights-of-way, may threaten the transmission line because they could fall into the conductor (wires) or structures . . . . BPA *will* arrange to remove these trees." Curtis Aff. Ex. L at 2-3, ECF No. 161-12 (emphasis added). BPA confirmed that the February 2011 statements accurately describe its policies. Sheppard Dep. 116:15-117:2.

Assuming the need to acquire legal rights or the need to consult with the Forest Service about the timing of removal gives BPA's crews some discretion, that discretion is grounded in routine safety maintenance and not in public policy. Sheppard Dep. 66:19-22 (keeping rights of way clear ensures public safety); *see also Chang*, 139 F.4th at 1097-98; *O'Toole*, 295 F.3d at 1036-37 (citing the government's obligation to prevent its property "from causing harm to others to the same extent that a private landowner must"); *Whisnant v. United States*, 400 F.3d 1177, 1182-83 (9th Cir. 2005) (listing cases).

---

[6] *Cf. Chang*, 139 F.4th at 1097 (citing national park staff members' statements describing conduct as routine maintenance in considering whether the discretionary function exception protected the conduct).

The identification and removal of a fall-into danger tree is not protected by the discretionary function exception. Immunizing the United States for standard maintenance of the sort here would run counter to the directive that courts should construe the FTCA's waiver broadly and its exceptions narrowly.

### B.    The Power Lines

The Adams Plaintiffs, Allard Plaintiffs, and Enfield Plaintiffs further allege that BPA's policies required the agency to take actions to manage the electricity running through power lines on September 7, 2020. These allegations focus on inaction prior to the fire (a failure to de-energize)[7] and after vegetation fell on the power lines (preventing the re-energization of the lines).[8] The Court considers these allegations together because they implicate the same policies and causal nexus (BPA's failure to prevent electricity from flowing through the power lines).

Some Plaintiffs, however, also allege that BPA negligently constructed, maintained, or inspected its power lines. Allard FAC ¶ 55; Adams SAC ¶ 1980.c; Enfield Compl. ¶ 57. The United States does not address these allegations in its motion but aims instead at BPA's alleged failure to de-energize the power lines or not to reenergize them after a power failure. The United States owes the burden to show that the exception applies to "the specific agency action challenged." *Young*, 769 F.3d at 1053; *see Schurg v. United States*, 63 F.4th 826, 832 (9th Cir.

---

[7] The Adams Plaintiffs and Enfield Plaintiffs argue the de-energization theory. The Adams Plaintiffs argue BPA failed to de-energize its own Cougar-Holden line, other lines that provided power to EWEB and LEC, and failed to institute a public-safety power-shutdown. Adams SAC at ¶ 1680. The Enfield Plaintiffs argue BPA was negligent in "[k]eeping breakers closed during extremely dangerous wildfire conditions" and further keeping them in automatic reclose. Enfield Compl. ¶ 57.

[8] The Allard Plaintiffs and Enfield Plaintiffs argue the re-energization theory, each arguing BPA was negligent in "[r]e-energizing its electric utility infrastructure after vegetation fell on its powerlines." Allard FAC ¶ 55; Enfield Compl. ¶ 57.

2023). The United States' motions are denied with respect to the construction, maintenance, and inspection of the line because it fails to address them.

BPA maintains the Open Access Transmission Tariff ("OATT"). The OATT "defines the terms and conditions under which [BPA] sell[s] transmission service," operating as an overarching service agreement between BPA and other utility providers. Curtis Aff. Ex. B ("OATT"), ECF No. 161-2; Curtis Aff. Ex. X 4, ECF No. 161-24. The OATT provides standards for BPA-provided services "in accordance with Good Utility Practice." OATT at 97. The OATT defines Good Utility Practice as:

> Any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Good Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather to be acceptable practices, methods, or acts generally accepted in the region, including those practices required by Federal Power Act Section 215(a)(4).

OATT at 14. Good Utility Practice incorporates by reference the Federal Power Act. OATT at 14. Section 215 of the Federal Power Act creates standards in furtherance of "electric reliability." 16 U.S.C. § 824*o.* The Federal Power Act, OATT, and Good Utility Practice are silent on a public safety power shutoff ("PSPS") (a policy which guides de-energization when safety is at issue), and BPA did not otherwise have a PSPS plan in place at the time of the fire. Cathcart Decl. ¶¶ 3,4 ECF No. 86.

At the first step of applying the discretionary function exception, the Court must assess whether the policies in question allow for discretion. *Lam*, 979 F.3d at 678. Operational decisions involving judgment of non-specific duties are discretionary. *Gaubert*, 499 U.S. at 331-32; *Navarette v. United States*, 500 F.3d 914, 916 (9th Cir. 2007) (holding a "'Guiding Principle' [to maintain] health, safety, security and comfort" did not mandate government conduct).

Good Utility Practice, by its text, requires "the exercise of reasonable judgment" in its goal of "accomplish[ing] the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition." It does not give BPA agents a specific course of action to follow. It calls for BPA officials to exercise their judgment to pursue general goals much like the Guiding Principle in *Navarette*.

Good Utility Practice also did not require BPA to have a PSPS policy in place at the time of the fire. Good Utility Practice incorporates policies adopted "by a significant portion of the electric utility industry" and those "generally accepted in the region." Although at the time of the Holiday Farm Fire, at least one utility in Oregon had adopted a PSPS and state officials had called for PSPS plans generally,[9] Good Utility Practice offers no metrics or mandatory standard to discern if a policy has been adopted by "a significant portion of the electric utility industry" or become "generally accepted in the region." The policy's text further requires that generally accepted practices still be weighed against the competing objectives of reliability, safety, and expedition. BPA officials therefore had an element of judgment in their conduct.

When the government acts with discretion, that discretion is presumptively grounded in public policy. *Lam*, 979 F.3d at 674. Good Utility Practice requires balancing multiple interests, including "good business practices, reliability, safety and expedition." Reliability is a central operational goal of BPA, with transmission operators expected to prioritize keeping the system running. Sanford Decl. ¶ 3, ECF No. 85. BPA's System Dispatchers' Standing Order No. 136 gives dispatchers "the authority . . . to take whatever action is required to preserve the [system's] reliable operation," including de-energizing power lines. Sanford Decl. Ex. A 1, ECF No. 85-1;

---

[9] Levin. Aff. Supp. Allard Pls.' Resp. Def. United States' Mot. to Dismiss ¶¶ 14, 15, ECF No. 160.

Curtis Aff. Ex. Z ("Sanford Dep.") 58:6-8, ECF No. 161-26. BPA operators understand that "the entire purpose of the scheme" is to keep the power running. Sanford Dep. 67:11-15.

Dispatchers are required to weigh their directive to maintain the system's reliability against considerations like safety, expediency, and good business practices before de-energizing power lines or preventing their re-energization. *See* Sanford Dep. 74:18-75:13 (expressing risks to de-energizing equipment like preventing a fire department from pumping water and stating BPA's "core mission is to move energy"). In this way, the decision to keep energy in BPA's lines is like the decision to cut down the tree in *Lam* because both require a choice among competing policy goals. Although BPA dispatchers may rely on professional and technical experience to choose between the policy goals, the choice itself involves balancing competing objectives grounded in political, social, or economic policy.

The Enfield, Allard, and Adams Plaintiffs argue the United States cannot show that allowing the energization of BPA's power lines implicated policy concerns. The government need not show it actually engaged in policy-weighing. *Terbush*, 516 F.3d at 1137 n.5; *see also Lam*, 979 F.3d at 674 ("[T]he district court must not focus on or even consider the employee's actual thinking about what to do or not do."). The United States must only show its decisions are susceptible to policy analysis to invoke the discretionary function exception. *Green v. United States*, 630 F.3d 1245, 1251 (9th Cir. 2011). The OATT's text and the record indicate that BPA's decision not to prevent electricity from running through its transmission lines—either by de-energizing them or preventing their re-energization—is grounded in public policy. The discretionary function exception bars the claims involving the de-energization or re-energization of BPA's power lines.

C.      Causation

The United States argues that theories of causation require this Court to dismiss all claims if it finds, as the Court has here, that the discretionary function exception protects the decision to leave the power lines energized but not the identification or removal of the danger tree. Courts, in analyzing the discretionary function exception, "cannot wholly ignore causation concepts when a robust exercise of discretion intervenes between an alleged government wrongdoer and the harm suffered by a plaintiff." *Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1285 (9th Cir. 1998); *but see United Cook Inlet Drift Assoc. v. Trinidad Corp. (In re The Glacier Bay)*, 71 F.3d 1447, 1451 (9th Cir. 1995) (holding that issues of proximate cause went to negligence and were therefore irrelevant to the discretionary function exception). The United States relies primarily on *General Dynamics*, a case plainly distinguishable from this one. In *General Dynamics*, the plaintiff sued non-immune federal employees who prepared a report to circumvent the immunity shielding the federal prosecutors who acted on the report. *Id.* at 1283. Because the harm "actually flow[ed] from the prosecutor's exercise of discretion" and that discretion was independent of the report, the Court rejected the plaintiff's "attempt to recharacterize the action as something else" than an attack on the prosecutors' actions. *Id.* at 1286.

The United States contends that leaving the power lines energized is an intervening discretionary act, cutting off liability for the danger tree claims. Unlike the plaintiff in *General Dynamics*, Non-Movants here allege a separate cause-in-fact of their injuries and do not attempt to reframe harm that actually flows from the decision to leave the power lines energized. Moreover, courts generally allow remaining claims to proceed after finding at least one alleged but-for cause is protected by the discretionary function exception. *See, e.g.*, *In re The Glacier Bay*, 71 F.3d at 1451 ("Each separate action must be examined to determine whether the specific

actor had discretion of a type Congress intended to shield."); *Terbush*, 516 F.3d at 1128-40 (holding the design of a wastewater system was protected by the discretionary function exception, remanding to determine the exception's applicability to maintenance of a wastewater system, and holding that the exception barred a failure to warn claim); *Sigman v. United States*, 217 F.3d 785, 793-99 (9th Cir. 2000).

The United States has not shown that the Non-Movants' danger tree claims must be dismissed because the discretionary function applies to their separate de-energization theory.

## CONCLUSION

For the reasons discussed above, Defendant United States' Motions to Dismiss (ECF Nos. 84; ECF No. 116; *Enfield v. United States*, No. 6:25-cv-00554-MTK ECF No. 17) are DENIED in part and GRANTED in part as follows: the motions are granted with respect to the Non-Movants claims alleging BPA caused the Holiday Farm Fire by failing to prevent the energization of its power lines, and those claims are dismissed with prejudice. Defendant United States' motions are otherwise denied.

DATED this <u>11th</u> day of February 2026.

<u>s/ Mustafa T. Kasubhai</u>
MUSTAFA T. KASUBHAI (he/him)
United States District Judge
