**Rick Klingbeil, OSB #933326**
Rick Klingbeil, PC
1826 NE Broadway
Portland, OR 97232
503-473-8565

**Brady Mertz, OSB #970814**
brady@bradymertz.com
Attorney at Law, Brady Mertz, PC
685 Church Street NE
Salem, OR 97301
Ph: 503-385-0121

**Robert Curtis, CA Bar #203870**
rcurtis@foleybezek.com
15 W. Carrillo St.
Santa Barbara, CA 93101
Ph: 805-962-9495

**Alexander Robertson, IV, CA Bar #127042**
arobertson@arobertsonlaw.com
Robertson & Associates, LLP
32121 Lindero Canyon Road, Suite 200
Westlake Village, California 91361
Ph: 818-851-3850

Of Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**EUGENE DIVISION**

| | |
|---|---|
| 21st CENTURY CENTENNIAL INSURANCE COMPANY, et al., <br><br> **Plaintiffs,** <br><br> *v.* <br><br> UNITED STATES OF AMERICA, et al., <br><br> **Defendants.** | Case No. 6:24-cv-00089-MTK (Lead Case) <br> **Case No. 6:24-cv-00092-MTK (Trailing Case)** <br> Case No. 6:24-cv-00203-MTK (Trailing Case) <br> Case No. 6:24-cv-01152-MTK (Trailing Case) <br> Case No. 6:25-cv-00554-MTK (Trailing Case) <br> Case No. 6:24-cv-01559-MTK (Trailing Case) <br> ***ADAMS* PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026** |

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................................... 1

II.  THE ORDER WAS PROPERLY ISSUED EX PARTE AND REMAINS VALID ................ 3

   A.  The Ex Parte Showing Was Substantial, Not Conclusory. ...................................... 3

   B.  The Authorities on Which the Government Relies, Properly Read, Support Rather Than Undermine the Order. ................................................................................................ 6

   C.  The Order Satisfies Rule 65(b)(2). ........................................................................ 12

   D.  The Order's Scope Was Tailored to the Documented Harm. ............................... 14

III.  THE "DISCOVERY DISPUTE" FRAMING DOES NOT FIT THE FACTS OF THIS CASE ............................................................................................................................... 16

   A.  The Productions at Issue Were Made to the Non-BPA Parties in This Case. ...................... 16

   B.  The *Allard* (and Adams) Requests Were Specific, and CFC Counsel's Contemporaneous Treatment Confirms the Conduct Presented a Discovery Dispute. .......................................... 17

   C.  The TRO Is Preservation Relief, Not a Discovery Compulsion. ......................................... 20

IV.  THE "CONCERNS HAVE BEEN ADDRESSED" REPRESENTATION CANNOT SUPPORT DISSOLUTION ................................................................................................. 20

   A.  The Beck Declaration's Generalized Justifications Do Not Match the Specific, Layer-by-Layer Deletions Recorded in the Metadata. ................................................................................... 22

   B.  The Gilmour Declaration Reframes the Editor-Tracking Issue Instead of Resolving It..... 29

   C.  The Locating Job Has Continued To Run on the Protected Feature Class After the Order, and Was Not Disclosed Until May 13, 2026. ........................................................................... 30

   D.  The Iron Mountain Backups, the BPA Snapshot, and the BPA-Conducted Workstation Imaging Are Not Substitutes for the Imaging. ........................................................................ 32

V.  THE ALTERNATIVE REQUEST TO POSTPONE THE PRELIMINARY-INJUNCTION HEARING SHOULD BE DENIED ................................................................................... 35

VI.  NO SECURITY IS REQUIRED ......................................................................................... 36

VII.  CONCLUSION .................................................................................................................... 37

# TABLE OF AUTHORITIES

**Cases**

Adobe Systems, Inc. v. South Sun Products, Inc., 187 F.R.D. 636 (S.D. Cal. 1999) ..................... 9

American Can Co. v. Mansukhani, 742 F.2d 314 (7th Cir. 1984) .............................. 3, 6, 7, 12, 13

Capricorn Power Co. v. Siemens Westinghouse Power Corp., 220 F.R.D. 429 (W.D. Pa. 2004) 20

Chambers v. NASCO, Inc., 501 U.S. 32 (1991) .......................................................................... 15

Diaz v. Brewer, 656 F.3d 1008 (9th Cir. 2011) ........................................................................... 36

Duncan v. Walker, 533 U.S. 167 (2001) ...................................................................................... 31

Empirical Foods, Inc. v. Primus Builders, Inc., No. 8:19CV457, 2020 WL 5064220 (D. Neb.
    Aug. 27, 2020) .................................................................................................... 9, 10, 11

First Technology Safety Systems, Inc. v. Depinet, 11 F.3d 641 (6th Cir. 1993) ........................ 7, 8

Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423 (1974)

Humble Oil & Refining Co. v. Harang, 262 F. Supp. 39 (E.D. La. 1966) ............................... 9, 10

Humble Oil & Refining Co. v. Sun Oil Co., 175 F.2d 670 (5th Cir. 1949) ............................... 9, 11

In re Vuitton et Fils S.A., 606 F.2d 1 (2d Cir. 1979) .................................................................. 8, 9

It's A 10, Inc. v. Beauty Elite Group, Inc., 932 F. Supp. 2d 1325 (S.D. Fla. 2013) ................. 9, 10

Jorgensen v. Cassiday, 320 F.3d 906 (9th Cir. 2003) .................................................................. 36

Kearney v. Foley & Lardner, LLP, 590 F.3d 638 (9th Cir. 2009) ............................................... 14

Leon v. IDX Systems Corp., 464 F.3d 951 (9th Cir. 2006) .......................................................... 14

Metex Corp. v. ACS Industries, Inc., 748 F.2d 150 (3d Cir. 1984) .......................................... 9, 11

Playboy Enterprises, Inc. v. Welles, 60 F. Supp. 2d 1050 (S.D. Cal. 1999) ............................... 34

Procaps S.A. v. Patheon Inc., No. 12-24356-CIV, 2014 WL 11498061 (S.D. Fla. Dec. 30, 2014)
    ...................................................................................................................................... 15

Pueblo of Laguna v. United States, 60 Fed. Cl. 133 (2004) .................................................. 15, 20

Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126 (9th Cir. 2006) .............................. 3, 4, 8

Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113 (9th Cir. 2005) ............................................ 36

Treppel v. Biovail Corp., 233 F.R.D. 363 (S.D.N.Y. 2006) ........................................................ 20

Washington v. Trump, 145 F.4th 1013 (9th Cir. 2025) ........................................................... 11, 12

**Rules**

Federal Rule of Civil Procedure 65(b) ................................................................... 3, 12, 13, 35, 36

Federal Rule of Civil Procedure 65(c) .................................................................................... 15, 36

Federal Rule of Civil Procedure 37 .................................................................................... 17

**Statutes and Regulations**

18 U.S.C. § 2071.............................................................................................................. 37

28 U.S.C. § 1746

44 U.S.C. § 3106.............................................................................................................. 37

44 U.S.C. §§ 3551–3558 (Federal Information Security Modernization Act) ............................. 37

NIST SP 800-53 (Security and Privacy Controls) ............................................................... 37

## I.  INTRODUCTION

The United States moves to dissolve a preservation order it claims it has "substantially complied with." Mot. 2. The motion does not contest the metadata evidence on which the Order rests. On December 19, 2025, BPA stripped 82 of 103 fields across three principal LiDAR layers. It did so in a tightly compressed sequence of *DeleteField*, *UpdateSchema*, *ExportFeatures*, and *Rename* operations. On the most probative layer, four consecutive nights of *DisableEditorTracking*/*EnableEditorTracking* cycling on the live source table preceded those deletions.

BPA's April 17, 2026 "cure" repeated the pattern. The TransLineSpan file remained byte-for-byte identical to the December production except for three bytes recording the internal last-update date; the Vegetation Encroachments layer received its column headers back, but only twelve of thirty-six fields were populated. See *Ex Parte* Mot., Klingbeil Decl. Ex. 1 (Bovie Rep.) (ECF 254-3). The Bovie Report's overall conclusion is uncontested in the motion: the modifications were systematic, targeted at areas of interest near the ignition zone, and captured in BPA's own metadata. Bovie Rep. 28. The deletions specifically included the cross-layer primary keys (*StrcSerialNbr*, *BackStrcSerialNbr*, *AheadStrcSerialNbr*) that would let an analyst test the *Adams* Plaintiffs' allegation that the fire-causing tree was "near BPA structure 5/2" — a merits allegation the United States denies.

The Government's response is to reframe. The conduct becomes "discovery issues" attributable to "imprecise discovery requests" and to "an expert's misunderstanding of a recurring automated process." Mot. 2. The 82-field stripping becomes ordinary production-preparation work by a team applying its "understanding of the request." Beck Decl. ¶ 9; see Mot. 13. The editor-tracking cycles become the harmless artifact of a nightly automated script. *Id.* at

Page 1 **-**    *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

13–14 (citing Gilmour Decl. ¶¶ 5–6). The April "cure" anomaly becomes "human error in exporting the data." Beck Decl. ¶ 16; see Mot. 13.

The remedy is recast at once as cumulative of existing preservation duties and as a $320,000 imposition. Mot. 10. The *ex parte* procedure is criticized for lacking discrete Rule 65(b)(2) recitations, though the Government does not show that any missing recital would have altered the Order on the record then before the Court. And the only meaningfully contested element of the relief — the forensic imaging by a neutral examiner under Paragraph 6 — is attacked not on its merits but on its intrusiveness.

The Court should reject each of those moves. The record on May 8 was the kind on which *ex parte* preservation relief is appropriate: contemporaneous metadata from the systems at issue, a documented pattern rather than mere suspicion, and a defendant this Court has already found willfully spoliated evidence in this very case. The Order is narrow, time-bounded, and tailored. It preserves identified categories of evidence, requires a litigation hold and inventory of pre-existing backups, and requires forensic imaging of identified artifacts by a neutral examiner under seal pending the preliminary-injunction hearing. The Government concedes that BPA was already obligated to do all of those things, save the imaging itself.

The intervening developments confirm the Order's necessity rather than its dissolution. The Government's declarations supply categorical, generalized justifications for the field stripping that do not match the field-specific, technically varied deletions the metadata records. Its contemporaneous correspondence characterized the underlying matter as a "potential discovery dispute" needing to be "obviated." Kim Decl. ¶ 17. And the declarations now disclose that automated processes that disable editor tracking on the protected source feature classes continued to run after the Order entered, a fact not disclosed to the Adams Plaintiffs until May

Page 2 - ***ADAMS* PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

13, 2026. The Government's framing of its "substantial compliance" as a basis for dissolution mistakes the relationship between compliance and necessity: substantial compliance with an order whose substantive provisions are warranted confirms the order's appropriateness. The diligent efforts the Government describes (litigation hold, backup inventory, workstation imaging, snapshot, FTI engagement) reflect the substantive validity of what the Order required. They do not justify foreclosing the one element the Government has not yet completed: the neutral forensic imaging Paragraph 6 prescribes.

The motion should be denied.

## II.  THE ORDER WAS PROPERLY ISSUED
## *EX PARTE* AND REMAINS VALID

Under Federal Rule of Civil Procedure 65(b)(4), the adverse party to a TRO issued without notice "may appear and move to dissolve or modify the order." The moving party bears the burden. The Government's substantive arguments fall into three categories: the *ex parte* procedure was inappropriate (Section II.A); the Order fails Rule 65(b)(2)'s recital requirements (Section II.C); and the Order's scope is excessive (Section II.D). Section II.B addresses the case authority the Government invokes across all three arguments and shows that, properly read, it supports rather than undermines the Order. Section IV addresses the Government's argument that "the concerns raised by the *Ex Parte* Motion have been addressed." Mot. 15.

### A.  The *Ex Parte* Showing Was Substantial, Not Conclusory.

The Government correctly identifies the governing standard. The Ninth Circuit, building on *American Can Co. v. Mansukhani*, 742 F.2d 314 (7th Cir. 1984), permits *ex parte* relief in a "narrow band of cases" where notice "would render fruitless the further prosecution of the action." *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). The

Page 3 -  *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

question is whether the movant has shown that "defendants would have disregarded a direct court order and disposed of the [evidence] within the time it would take for a hearing." *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993); accord *Am. Can*, 742 F.2d at 323. A "single conclusory statement by counsel" will not do. *Reno Air Racing*, 452 F.3d at 1132.

The *Ex Parte* Motion did not rest on conclusory statements. It was supported by a 35-page memorandum and a 36-page expert report drawn from BPA's own machine-generated metadata. See Klingbeil Decl. Ex. 1 (Bovie Rep.). The metadata-based findings are not allegations; they are observations of file contents and metadata that the Government does not contest. See Mot. 12.

Those findings include: 82 of 103 fields stripped within a single morning using three distinct technical methods across four layers; deletions in the most probative layer preceded by four consecutive evenings of editor-tracking disable/enable cycles clustered around 21:22 to 21:34 local time, each lasting two to three minutes; an April 17 "cure" that perpetuated the December deletions on the TransLineSpan layer (byte-for-byte identical except for three timestamp bytes, and populating only twelve of thirty-six fields on the Vegetation Encroachments layer); and the April export itself preceded by a second cluster of editor-tracking cycles on the same feature class.

The risk of further alteration was not speculative; it rested on three independent showings documented in the *Ex Parte* Motion. First, this Court has already found that BPA willfully spoliated physical evidence at the Holiday Farm Fire ignition site and contractor ESI. Op. & Order 11, 14, 17 (ECF 198). The Court further characterized the United States' failure to prepare its 30(b)(6) designee on grounds previously rejected by the Court as "abuse of the judicial process." *Id.* The Court "caution[ed] the United States on opposing production of [LiDAR]

Page 4 -    *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT**
            **UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER**
            **DATED MAY 8, 2026**

evidence unless it intends to present arguments opposing such production that present substantial merit." *Id.* at 20. Second, the metadata itself documents the technical capability to alter geodatabase records in ways that mask the alterations. For example, BPA can perform *ExportFeatures* to a flat shapefile, apply *DeleteField* and *UpdateSchema* outside the source database environment, and then rename the resulting file. Bovie Rep. 9–15. Third, the documented behavior was a repeating pattern, not an isolated event: a December cluster of editor-tracking cycles preceded the December 19 stripping, and an April cluster preceded the April 17 export bearing identical marks. *Id.* at 17–22. These are the kind of objective indicia from which a court may infer disregard of a forthcoming order in the gap before a hearing.

The Government emphasizes that on April 10, 2026, the *Allard* plaintiffs informed CFC Counsel of the December stripping, and that BPA "attempted to remedy the issue with a supplemental production" on April 20. Mot. 4, 9. The Government argues that any risk of further destruction was speculative because BPA had "notice on April 10 … and already had the opportunity to make changes." Mot. 9. The argument has the inference reversed.

The Bovie Report establishes that following the April 10 notice, BPA *did* make further changes: the April 17 export was preceded by a second cluster of editor-tracking cycles between April 12 and 16, and the resulting "cure" on the TransLineSpan layer was byte-for-byte identical to the December production except for three bytes of timestamp metadata. Bovie Rep. 18–22. Far from showing the risk had passed, the April events documented the pattern continuing.

Further, the Government suggests that ordinary conferral should have preceded the motion. Mot. 8. But conferral on a target's preservation conduct is the precise scenario the *ex parte* exception was developed for, particularly where conferral would happen before the target knows the conduct has been detected. The April events showed that even after the *Allard*

Page 5 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

plaintiffs raised the December stripping informally, BPA's response was a further export bearing the same pre-export cycling. Whatever the explanation, <u>most of the primary data fields in the April production were still empty</u>. Conferral on that record would have required disclosing to BPA both the second cluster of cycling and the blank fields. As the Government acknowledges, BPA controls the system exclusively.

**B. The Authorities on Which the Government Relies, Properly Read, Support Rather Than Undermine the Order.**

The Government's arguments anchor in three clusters of authority: the propriety of *ex parte* relief (Mot. 7–9), the relationship between preservation and discovery (Mot. 12), and the appropriate scope of injunctive relief (Mot. 10). Each, examined on its facts and holdings, supports the May 8 Order more readily than it undermines it.

**1. The *ex parte* authorities.** *American Can Co. v. Mansukhani*, 742 F.2d 314 (7th Cir. 1984), is the principal authority on which the Government rests its argument that the *ex parte* procedure was inappropriate. Mot. 7–9. The Seventh Circuit set aside the order in *American Can* because the record there "d[id] not support any presumption that the defendants would have deliberately disregarded a direct court order" to preserve the evidence at issue. 742 F.2d at 323. That is the predicate *American Can* identifies as the missing ingredient that, if present, would have warranted the relief.

Here, this Court has already found that BPA willfully spoliated evidence in this very case. Op. & Order 11, 14, 17 (ECF 198). The Court "caution[ed] the United States on opposing production of [LiDAR] evidence unless it intends to present arguments opposing such production that present substantial merit." *Id.* at 20. *American Can* does not condemn the record here. The prior judicial findings are exactly the showing its analysis identifies as the proper basis for relief.

Page 6 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

The Government suggests in passing that the prior spoliation finding does not warrant the inference because "the Court's spoliation ruling occurred after the January 15, 2026, production at issue." Mot. 9. The temporal sequence is correct but not material. The missing ingredient *American Can* identifies is not whether the defendant has previously defied a court order; it is whether the defendant has shown a propensity to dispose of evidence within the time it would take for a hearing. 742 F.2d at 323. This Court's findings of willful spoliation against the same defendants in the same litigation establish that propensity, whether entered before or after the December 19 stripping. If a defendant had to be under a prior court order to dispose of evidence before *ex parte* relief became available, the exception would never apply.

For the same reason, the Government's parallel framings — that the prior spoliation involved only physical evidence ("the movement and cutting of a tree by contractors . . . not software manipulation") and "occurred prior to any litigation" (Mot. 9) — also miss. This Court's findings encompass spoliation of contractor ESI, not just physical evidence. Op. & Order 16–17. And the Court found BPA's preservation duty arose on September 9, 2020, based on reasonably foreseeable litigation, not the later commencement of formal proceedings. Op. & Order 11–12.

*First Technology Safety Systems, Inc. v. Depinet*, 11 F.3d 641 (6th Cir. 1993), is to the same effect. The Government cites *First Tech.* for the proposition that "the applicant must do more than assert that the adverse party would dispose of evidence if given notice." Mot. 8 (quoting 11 F.3d at 650). The opinion goes on to specify the type of showing that does suffice: "plaintiffs must show that defendants would have disregarded a direct court order and disposed of the [evidence] within the time it would take for a hearing." *Id.* The Sixth Circuit reversed because the moving party had relied on generalized industry-wide assertions rather than

Page 7 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

defendant-specific evidence. Here, the showing is the conduct of these defendants, on these systems, in this case — documented in the defendant's own metadata and bracketed by this Court's prior findings. *First Tech.* identifies the kind of defendant-specific showing that justifies *ex parte* relief; *Adams*' record matches it.

*Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126 (9th Cir. 2006), provides the governing standard in this Circuit. The court vacated the order before it because the moving party's showing of risk consisted of "a single conclusory statement by counsel" about infringers in general. 452 F.3d at 1132. The Ninth Circuit emphasized that this statement "hardly qualified as evidence and certainly did not link the TRO application to McCord." *Id.* The Government cites *Reno Air* as if *Adams*' showing parallels the inadequate one the Ninth Circuit rejected. *Adams*' record is the opposite: a 35-page memorandum, a 36-page expert report drawn from BPA's own metadata, and this Court's prior findings against the same defendants — not a "single conclusory statement." The showing satisfies the standard *Reno Air* articulates.

*In re Vuitton et Fils S.A.*, 606 F.2d 1 (2d Cir. 1979), goes further still. The Government cites *Vuitton* as one of a small number of cases in the "narrow band" where *ex parte* relief is proper. Mot. 8. The Government omits that *Vuitton* is a case where the Second Circuit granted *mandamus* directing the district court to issue an *ex parte* TRO that the district court had refused to issue. The court held that on the showing presented "a plaintiff is entitled to have issued an *Ex parte* temporary restraining order." 606 F.2d at 4. The Second Circuit explained: "If notice is required, that notice all too often appears to serve only to render fruitless further prosecution of the action. This is precisely contrary to the normal and intended role of 'notice,' and it is surely not what the authors of the rule either anticipated or intended." *Id. Vuitton* does not limit *ex parte*

Page 8 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

relief; it compels it where a documented pattern is present. *Adams*' showing — a documented pattern captured in the defendant's own metadata — fits *Vuitton* comfortably.

Finally, *Adobe Systems, Inc. v. South Sun Products, Inc.*, 187 F.R.D. 636 (S.D. Cal. 1999), which the Government cites at Mot. 7 for the "absent party's advocate" principle and at Mot. 7–8 as an example of the "narrow band," in fact *denied ex parte* relief because the plaintiffs had not shown that *the particular defendant* was likely to destroy evidence. 187 F.R.D. at 641. That holding cuts toward *Adams*, not against. Where the risk of evidence loss is documented in the target's own metadata rather than supplied by generalized assertion, the showing the *Adobe* court found missing is present.

**2. The "injunction in lieu of discovery" authorities.** The Government's second cluster of authority is its contention that "injunctive relief is not normally available in aid of or in lieu of discovery." Mot. 12. The Government cites *Humble Oil & Refining Co. v. Harang*, 262 F. Supp. 39 (E.D. La. 1966); *It's A 10, Inc. v. Beauty Elite Group, Inc.*, 932 F. Supp. 2d 1325 (S.D. Fla. 2013); *Empirical Foods, Inc. v. Primus Builders, Inc.*, No. 8:19CV457, 2020 WL 5064220 (D. Neb. Aug. 27, 2020); *Metex Corp. v. ACS Industries, Inc.*, 748 F.2d 150 (3d Cir. 1984); and *Humble Oil & Refining Co. v. Sun Oil Co.*, 175 F.2d 670 (5th Cir. 1949). The proposition is correct as a general matter. The cases do not, however, apply to this Order. The Order compels no production. It is preservation relief, not discovery in disguise.

*Empirical Foods* is the closest factual analogue among the cases the Government cites, and it cuts firmly the other way. The court there received a motion captioned as one for a TRO and preliminary injunction. The moving party sought to stop the dismantling of an Automated Storage and Retrieval System needed for litigation inspection. The court recharacterized the motion as a discovery motion, recognizing that preservation relief is not strictly injunctive, and

Page 9 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

then **granted** the requested relief: "empirical will be ordered not to dismantle any more of the ASRS System before the end-to-end testing is done." 2020 WL 5064220, at *17. The Government cites the case for the unobjectionable proposition that injunctive relief is not normally available in aid of discovery, Mot. 12, but its actual holding is that preservation relief, on a record showing a real risk of loss before testing could occur, *is* available, whether captioned as a TRO or as a discovery order. The May 8 Order does exactly what *Empirical Foods* approved.

*Humble Oil & Refining Co. v. Harang* denied a preservation injunction on facts in which the defendant "testified under oath" that he would not destroy documents and offered to produce them in normal discovery. 262 F. Supp. at 41–43. There was no finding of bad faith or prior spoliation. The court emphasized that the moving party "offered no proof" of imminent destruction beyond "the otherwise unsupported affidavit" it had submitted. *Id.* at 43. Here, BPA represented at the relevant point that the production was complete, while the metadata showed 82 fields had been stripped before production, and this Court has already found willful spoliation by the same defendant. *Harang*'s rationale (no bad faith, speculative harm) is the precise opposite of the showing here.

*It's A 10, Inc. v. Beauty Elite Group, Inc.* likewise denied an injunction against spoliation because the plaintiff "offer[ed] no proof" that the defendant was likely to destroy records. 932 F. Supp. 2d at 1335. The court distinguished cases in which moving parties had shown actual prior destruction, where injunctive relief was appropriate. *Id. Adams*' record falls on the appropriate-relief side of *It's A 10*'s line: prior judicial findings of willful spoliation against the same defendants, and contemporaneous metadata documenting a pattern of pre-production stripping

Page 10 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

and pre-stripping editor-tracking cycling. The holding does not foreclose this Order; it confirms when an order of this kind is proper.

*Metex Corp. v. ACS Industries, Inc.* is a Third Circuit decision dismissing an appeal for lack of appellate jurisdiction. 748 F.2d at 153–58. The substantive language the Government quotes at Mot. 12 appears in a footnote (156 n.11) and is dictum. That language suggests the moving party should "seek discovery of the materials at issue in this case directly from the government." *Metex* is not authority on what preservation relief is or is not available. It is authority on appellate jurisdiction over discovery-related orders. It does not support dissolution. The Government's further reliance on *Humble Oil & Refining Co. v. Sun Oil Co.*, 175 F.2d 670 (5th Cir. 1949), fails for a related reason: it is a pre-modern-Rules decision about whether an injunction could compel a survey of the defendant's land in place of Rule 34 production. The May 8 Order compels no access; it preserves evidence within the producing party's exclusive control.

Read together, these authorities stand for the principle that where ordinary discovery is available and the moving party fears only speculative harm, an injunction is not warranted. That principle does not reach this case. The May 8 Order does not compel production; it preserves evidence the moving party reasonably anticipates may otherwise be modified, overwritten, or expired on routine cycles, on a record of documented spoliation by the producing party. The closest factual analogue, *Empirical Foods*, granted exactly that relief on materially similar facts.

**3. The scope authority.** The Government cites *Washington v. Trump*, 145 F.4th 1013 (9th Cir. 2025), at Mot. 10 for the proposition that "injunctive relief must be tailored to remedy the specific harm alleged, and an overbroad injunction is an abuse of discretion." 145 F.4th at 1038 (internal citations and quotation marks omitted). That principle is correct, but its

Page 11 -  *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

application here favors the Order rather than dissolution. *Washington v. Trump* affirmed a universal preliminary injunction barring enforcement of Executive Order 14,160, with nationwide reach against multiple federal agencies. The Ninth Circuit held that the universal scope was appropriately tailored because narrower relief would not have provided complete protection. 145 F.4th at 1037–38.

The May 8 Order is, by comparison, modest: it preserves identified categories of evidence on identified systems controlled by a single defendant; it runs for a period not exceeding fourteen days; the parties have negotiated operational carve-outs; and a hearing is scheduled within the statutory window. If *Washington v. Trump*'s universal injunction met the tailoring requirement, the May 8 Order does as well.

Taken together, the Government's authorities are best understood as a framework that supports the Order. *Ex parte* relief is proper where the moving party makes a defendant-specific evidentiary showing supported by objective indicia rather than generalized assertion; preservation relief is proper where the risk of evidence loss is documented rather than speculative; and the scope of relief is proper where calibrated to the specific harm and systems implicated. *Adams*' record satisfies each element.

## C.  The Order Satisfies Rule 65(b)(2).

The Government's "facial invalidity" argument is that the Order does not state the "hour it was issued," "describe the injury and state why it is irreparable," or "state why the order was issued without notice." Mot. 9 (quoting Fed. R. Civ. P. 65(b)(2)). The argument rests on a single citation, *American Can*, 742 F.2d at 325. It rests further on the implicit suggestion that a Rule 65(b)(2) defect, in itself, is grounds for dissolution. Neither premise withstands scrutiny.

First, the Order is not the bare three-paragraph TRO at issue in *American Can*. It rests on the moving papers expressly incorporated by reference — a 35-page memorandum setting out the factual basis for irreparable harm, the legal standards for *ex parte* relief, and the grounds for proceeding without notice. The Court's reasoning is reflected in the Order's scope and specificity: Paragraphs 1 and 2 mirror the categories the moving papers identified as subject to truncation or overwrite on routine cycles; Paragraph 3 enumerates the precise operations the metadata identified as the methods used; and Paragraph 6 targets the specific systems on which the metadata anomalies appear.

The Government's own motion to dissolve, together with the Beck, Gilmour, and Dickson declarations, operates on the assumption that the Order's operative scope is unambiguous. Whatever else may be said about the absence of a discrete "why ex parte" recital, the Order satisfies Rule 65(b)(2)(B)'s requirement that it "describe … the acts restrained." If the Court concludes that any irreparable-harm or lack-of-notice finding required by Rule 65(b)(2) is implicit rather than express, those findings can be made explicit on the record without dissolving the Order.

Second, the Government identifies no prejudice from the absence of any specific Rule 65(b)(2) recital. Even cases applying Rule 65(b) strictly recognize that procedural defects are not freestanding grounds for dissolution; the question is whether the defect undermines the order's substantive validity or impedes the moving party's ability to oppose it. *American Can* itself reached its discussion of facial defects only after concluding that the underlying *ex parte* showing did not justify the order on its merits. 742 F.2d at 322–25. The Government's substantive disagreements have been preserved, conferred, and briefed; no missing recital has impeded any of that.

Page 13 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

Third, on irreparable harm, the Order's Paragraph 8 finding is itself a statement of the irreparable-harm rationale: the Order requires the United States to do no more than comply with its existing duty to preserve evidence in pending litigation. Loss of evidence subject to a known preservation duty is, by definition, harm not adequately remedied by money damages. The Ninth Circuit's spoliation jurisprudence reflects that principle. Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation." *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009) (quoting *Hernandez v. Garcetti*, 68 Cal. App. 4th 675, 680 (1998)). The harm is intrinsic to the loss of the evidence itself. See *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006).

## D.  The Order's Scope Was Tailored to the Documented Harm.

The Government contends the Order's scope "was far more extensive than necessary," Mot. 11, attacking Paragraph 3's prohibition on modifications and Paragraph 6's forensic imaging requirement. Neither argument supports dissolution.

On Paragraph 3, the parties addressed BPA's operational concerns through the Joint Motion to Modify (ECF 261), which the Court granted on May 14 (ECF 264). The modified Paragraph 3 permits BPA to "continue to utilize any and all source databases as required by its ordinary course of business, so long as the databases' audit tracking systems remain in place and operational." Modified Order ¶ 3 (ECF 264). It preserves in full the prohibition on, *inter alia*, "changes to editor-tracking settings, *UpdateSchema*, *DeleteField*, *ExportFeatures*, *ChangeVersion*, *CopyMultiple*, or *Rename* operations." *Id.* That is the precise calibration the Government suggests the original Order failed to provide. The modified Order, which the Government joined in seeking, achieves it.

Page 14 -  *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

On Paragraph 6, the imaging requirement is the irreducible core of the relief. The Government argues that third-party imaging is "not within the normal scope of preservation," imposes cost, and is therefore inconsistent with the Court's no-bond finding. Mot. 10. Those arguments do not undermine the imaging; they explain why it is necessary. BPA has exclusive control of the systems containing the evidence, and this Court has already found that BPA willfully spoliated other evidence in this litigation. Op. & Order 16–17.

BPA's existing preservation duties do not, alone, address the harm. The imaging is the minimum necessary to establish a record independent of BPA's representations about BPA's own systems — performed by a neutral examiner on artifacts the metadata identifies as bearing on the December and April patterns, and held under seal pending the preliminary-injunction hearing. That is not "beyond the scope" of preservation in a case of documented spoliation; it is what the Court's preservation power means in such a case. See, e.g., *Procaps S.A. v. Patheon Inc.*, No. 12-24356-CIV, 2014 WL 11498061, at *5–11 (S.D. Fla. Dec. 30, 2014); *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 138 (2004).

The Court's authority for the Paragraph 6 imaging flows not only from Rule 65 but also from its inherent power to manage proceedings and protect the integrity of judicial process. See *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–46 (1991). Where the Court has already found bad faith and willful spoliation by the same defendants in the same litigation, Op. & Order 11, 14, 17, the inherent power furnishes an independent basis for the modest measure of permitting a neutral examiner to image identified systems under seal pending hearing.

The cost estimate the Government provides (Mot. 10, citing Dickson Decl. ¶ 15) does not change the analysis. Rule 65(c) confides the amount of security to the Court's discretion. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005). The Order's no-bond finding

Page 15 - ***ADAMS* PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

rests on a determination that the Order asks no more than existing law requires. The imaging cost is a litigation expense allocable as the case proceeds; the Order anticipated as much, stating that costs "shall initially be borne by the United States, subject to reallocation at the preliminary-injunction hearing." Order ¶ 6. The estimate Mr. Dickson references was received by BPA on May 14, Dickson Decl. ¶ 15, one day before this motion was filed. The Government has not asked the Court to reallocate. The appropriate forum for that request is the May 21–22 hearing on a developed record, not a motion to dissolve seeking to foreclose the imaging entirely.

### III.  THE "DISCOVERY DISPUTE" FRAMING
### DOES NOT FIT THE FACTS OF THIS CASE

The Government's central substantive argument is that the issues raised in the *Ex Parte* Motion are routine discovery issues that "had not reached an impasse requiring court involvement in the Court of Federal Claims." Mot. 12. On that framing, the *Adams* Plaintiffs have plucked a non-party discovery dispute from another court and inflated it into *ex parte* relief here. The framing does not fit this record.

**A.  The Productions at Issue Were Made to the Non-BPA Parties in This Case.**

The Government's own statement of facts acknowledges that "On March 10, [2026,] the data was re-produced to the non-USA parties in the present case." Mot. 3. That is dispositive. The shapefile productions whose 82 stripped fields the Bovie Report documents were made for use in this case as well as in *Allard*. Whatever the discovery posture in the Court of Federal Claims, the Non-BPA Parties in this litigation are sharing discovery, the Government has acted

Page 16 -  *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

consistently with that[1], and the prejudice from the stripping and any potential erasure falls on the *Adams* Plaintiffs in this case.

The *Adams* Plaintiffs are not parties to *Allard*. They cannot file a Rule 37 motion in the Court of Federal Claims. Their access to the record depends on relief obtainable in this court, where they are parties — access that includes the source databases and the backups capturing the pre-stripping state of those databases. The Government's repeated suggestion that the appropriate course was a Rule 37 motion in the Court of Federal Claims, Mot. 12, 14–15, ignores the question of who would bring such a motion. The *Allard* plaintiffs may have their own reasons for taking, or not taking, particular procedural actions in their case. The *Adams* Plaintiffs cannot litigate by proxy in a forum to which they are strangers.

The Government's repeated invocation of the *Allard* plaintiffs' procedural choices, Mot. 9, 14–15, treats the absence of further *Allard* action between April 20 and May 15 as evidence that the dispute had not ripened. Whatever the *Allard* plaintiffs' litigation strategy may be, it cannot bind the *Adams* Plaintiffs, who received the same shapefile productions on March 10, 2026. Mot. 3. They are entitled to raise discovery concerns about productions made to them, in this case, in the forum where they are parties. That another party in another forum has not yet pressed a particular point does not foreclose the parties to whom the same data was produced from doing so in the forum where they appear.

**B.  The *Allard* (and *Adams*) Requests Were Specific, and CFC Counsel's Contemporaneous Treatment Confirms the Conduct Presented a Discovery Dispute.**

---

[1] If that were not so, then why has the Government not *separately produced* LiDAR data directly to the *Adams* Plaintiffs pursuant to this Court's directive issued 81 days ago?  This Court wrote: "the LiDAR evidence remains relevant and proportional with respect to the merits case. The Court cautions the United States on opposing production of this evidence unless it intends to present arguments opposing such production that present substantial merit." The United States first responded to the *Adams* plaintiffs' Requests for Production on December 17, 2024, so it has had over 17 months to consider and prepare the requests, and 81 days to provide the data directly to the *Adams* Plaintiffs as directed by the Court if it intended to do so in addition to a separate production to the *Allard* Plaintiffs.

Page 17 - ***ADAMS* PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

The Government's framing that the December 19 stripping resulted from "imprecise discovery requests," Mot. 2, 14, is supported neither by the request itself nor by the Government's contemporaneous handling. The *Allard* plaintiffs requested "Video footage, aerial and other photographs, and LiDAR (Light Detection and Ranging) images that most accurately and completely reflect the conditions of the COUGAR-HOLDEN CREEK CIRCUIT and surrounding vegetation immediately before 5:23 p.m. on September 7, 2020." Kim Decl. Ex. B at 14–16. That language is specific in two material respects: it identifies the corridor (Cougar-Holden Creek) and the temporal target (conditions immediately before the fire), and it imposes a substantive standard ("most accurately and completely reflect").

The *Adams'* requests 14 and 15 were even more inclusive and specific, leaving no wiggle room:

> REQUEST NO. 14: Produce any and all Documents relating to Light Detection and Ranging (LiDAR) surveys of trees within 200 feet of BPA's Cougar-Holden #1 115 kV transmission power lines in the area of Structures 5/1, 5/2 and 5/3 between January 1, 2015, to December 31, 2021.

> REQUEST NO. 15: Produce any and all Documents relating to the identification of "Danger Trees" or "Imminent Threats" (as defined in TLM-STD-7-2-1) based upon LiDAR surveys of trees conducted between January 1, 2015 and December 31, 2021 along BPA's Cougar-Holden #1 115 kV transmission power lines. (Klingbeil decl., Exhibit B, filed in support of Motion for TRO)

A request for the data that most accurately and completely reflects pre-fire vegetation conditions on a specified corridor cannot reasonably be interpreted as authorizing the pre-production removal of fields recording analyst observations of those very conditions. That is, the Comment field describing observed encroachments, the Species and DBH fields describing the trees observed, and the DueDt and Priority fields recording how BPA characterized the urgency

Page 18 - *ADAMS* PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT
UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER
DATED MAY 8, 2026

of corrective action. Those fields are not collateral to the request; they are the analytical content the request was designed to obtain. The Government does not address those broader requests.

The Government's contemporaneous handling is similarly inconsistent with the "no impasse" framing the motion advances. On April 10, 2026, the *Allard* plaintiffs notified CFC Counsel of concerns about "alterations or removals to the data set." Kim Decl. ¶ 13. CFC Counsel asked for specifics, and the plaintiffs provided a "preliminary list of the information he believed was missing." *Id.* ¶¶ 14–15. On April 17, CFC Counsel emailed Mr. Hill that the United States would produce a supplement to "address all of the points raised in the plaintiffs' preliminary list **in order to obviate a potential discovery dispute**." *Id.* ¶ 17 (emphasis added). That is the Government's own counsel, in writing, characterizing the underlying conduct as presenting "a potential discovery dispute" that the supplemental production was meant to "obviate." The Motion's present framing — that this was a routine conferral process that "had not reached an impasse," Mot. 14–15 — is not reconcilable with CFC Counsel's contemporaneous treatment.

Mr. Hill's same-day follow-up sharpens the picture. When CFC Counsel said "supplement," Mr. Hill asked whether the United States meant "the entire unaltered, pre-export LIDAR data." Kim Decl. ¶ 19. CFC Counsel said no — the United States would produce only "the missing pieces" to "avoid resending a huge file." *Id.* ¶ 20. Plaintiffs asked the threshold question; the United States declined to produce the original data, electing instead to patch the prior production. The April 17 production data answered whether the patch in fact addressed "all of the points raised": it did not. The TransLineSpan file in the April supplement is byte-for-byte identical to the December production except for three bytes of timestamp metadata, with

Page 19 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

corresponding SHA-256 hash identity. Bovie Rep. 19–20. The April "cure" for the Spans layer was the December production, re-stamped and re-sent.

The proposition that the dispute had not reached an impasse, that the appropriate forum was the Court of Federal Claims, and that ordinary conferral remained available is not consistent with the Government's own contemporaneous treatment. CFC Counsel called it a "potential discovery dispute," the plaintiffs asked for the original data, the United States refused, and the patch the United States offered did not in fact patch the most damaged layer.

## C.  The TRO Is Preservation Relief, Not a Discovery Compulsion.

The cases the Government cites for the proposition that "injunctive relief is not normally available in aid of or in lieu of discovery" address the use of injunctive relief to compel production or short-circuit ordinary discovery. They do not address preservation. See Section II.B above. The Order compels no production, no interrogatory answer, and no document response; it requires only that the evidence not be destroyed before any subsequent discovery dispute can be litigated. Federal courts routinely enter preservation orders in cases where ordinary discovery is ongoing, particularly where the moving party has shown a non-speculative risk of spoliation. See, e.g., *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133 (2004); *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 369–72 (S.D.N.Y. 2006); *Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 433–34 (W.D. Pa. 2004).

## IV.  THE "CONCERNS HAVE BEEN ADDRESSED"
## REPRESENTATION CANNOT SUPPORT DISSOLUTION

The Government's ultimate ask is that the Court treat its supporting declarations as having answered the questions the Order was entered to permit the parties and the Court to answer. Mot. 15–16. The declarations do not perform that work. Four problems demonstrate why

Page 20 -  *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

Paragraph 6's imaging remains necessary: the Beck declaration's categorical justifications do not match the layer-by-layer, field-by-field deletions the metadata records (Section IV.A); the Gilmour declaration reframes rather than resolves the editor-tracking issue (Section IV.B); the Locating Job has continued to run on the protected feature class after the Order, and was not disclosed until May 13 (Section IV.C); and the Iron Mountain backups, BPA snapshot, and BPA-conducted workstation imaging are not substitutes for a neutral forensic image (Section IV.D).

A preliminary point on the Motion's attack on Mr. Bovie's qualifications. The Motion characterizes Mr. Bovie as "a licensed Professional Electrical Engineer" who "is not an IT professional or an expert in digital forensics," questioning "whether he has the requisite expertise to opine on the databases at issue here." Mot. 13–14; *see also* Mot. 16 (same). The characterization is incomplete.

Mr. Bovie holds both the P.E. license and the IAAI-FIT certification (International Association of Arson Investigators – Fire Investigation Technician). Bovie Rep. vi, 29. His engagement, as the Report states, was "to perform an investigation into electrical engineering **and computer engineering** aspects connected with the Holiday Farm Fire." Bovie Rep. vii (emphasis added). The Report's stated scope is "a technical analysis of potentially modified or redacted data" — an examination of the contents and metadata of files BPA produced. *Id.*

More fundamentally, the Bovie Report's principal findings do not depend on subjective expert judgment. The Report records file names, timestamps, deleted field names, SHA-256 hash comparisons, TLSH similarity scores, byte-for-byte equality findings, and the contents of metadata fields BPA's own systems generated — objective facts recoverable from the file contents themselves. The Government's declarations do not contest the underlying observations; they recharacterize the cause.

Page 21 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

The Government also offers no competing IT or digital forensics expert. Mr. Dickson is a project manager; Mr. Beck is BPA's Lead Geographer; Mr. Gilmour is a BPA developer. None claims qualifications in the IT or digital-forensics specialties the Motion asserts Mr. Bovie lacks. If the Government intends to challenge the metadata findings on expert-qualification grounds, the proper vehicle is a *Daubert* motion supported by competing expert testimony — which the Government has not filed. To the extent the Motion notes that Mr. Bovie's CV was not served on counsel, Mot. 14, Plaintiffs will serve it; the omission does not bear on the Order's validity.

## A. The Beck Declaration's Generalized Justifications Do Not Match the Specific, Layer-by-Layer Deletions Recorded in the Metadata.

The uncontested facts bear identification at the outset. The Government does not contest, in the motion now before the Court, the following: that on the morning of December 19, 2025, BPA stripped 82 of 103 fields from three principal LiDAR layers using *DeleteField*, *UpdateSchema*, *ExportFeatures*, and *Rename* operations recorded in the metadata; that 36 of 46 fields were removed from the Vegetation Encroachments layer within approximately three minutes; that those deletions were preceded by four consecutive nights of editor-tracking disable/enable cycles on the live source feature class between December 13 and December 18, 2025; that the April 17, 2026 "cure" left the Transmission Spans file byte-for-byte identical to the December production except for three timestamp bytes, and populated only 12 of 36 fields on the Vegetation Encroachments layer; and that the April export was preceded by a second cluster of editor-tracking cycles on the same source feature class between April 12 and April 16, 2026. See Bovie Rep. 8–22; Beck Decl. ¶¶ 7–16; Gilmour Decl. ¶¶ 4–8. The Motion's substantive engagement with these facts is to recharacterize the cause, not to dispute the facts themselves.

The Government's recharacterization rests on the Beck declaration. Mr. Beck, BPA's Lead Geographer, supervises BPA's use of aerial LiDAR technology and the analytical outputs

Page 22 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

derived from it. Beck Decl. ¶¶ 1–3. He states that he and his "team" prepared the production on or about December 18 and 19, 2025, and that he personally delivered the production drives to BPA legal counsel on December 19. *Id.* ¶¶ 7, 11. He offers two categorical rationales for the field removals: as to the grow-into analysis layer, the unincluded fields were "not derived from LiDAR data and generally fall outside the scope of my group and data management," *id.* ¶ 8; and as to the three transmission-infrastructure shapefiles, "[W]e removed fields we thought were redundant, obsolete, or contained security sensitive information (specifically the kilovolts of the transmission line)," *id.* ¶ 9. The modifications, he avers, were intended "to produce data that would be useable by the recipient based on our understanding of the request." *Id.* Those generalized rationales do not match the specific deletions the Bovie Report documents.

First, the categorical reasons do not fit the Vegetation Encroachments layer — the most probative layer in the production. Bovie Rep. 13. The layer recorded specific trees encroaching on BPA's right-of-way; the source table contained 46 fields and 38 records. *Id.* Of those 46 fields, 36 were removed in roughly three minutes on December 19, 2025. *Id.* at 11–13. The deleted fields include **Comment** (the only free-text analyst observation field on the layer, structurally analogous to a clinician's note in a medical chart), **Species** (tree species), **DBH** (diameter at breast height), **DeferReasn** (reason for deferring corrective action), **DueDt** (priority due date), **Priority**, **MarkColor**, **Dead**, and **CompleteDt**.

These fields record the operational judgments BPA's vegetation-management analysts reached about specific hazardous trees on the Cougar-Holden corridor before the Holiday Farm Fire. None of those fields is plausibly "kilovolts of the transmission line." None is "redundant" with LiDAR data, which records three-dimensional spatial measurements rather than analyst characterizations. None is "obsolete"; these are the fields BPA was using to manage the corridor.

Page 23 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

BPA's 2018 grow-into analysis of the Cougar-Holden Line identified categories of "cycle maintenance" and "danger brush." Beck Decl. ¶ 5. The Comment, Species, DBH, DeferReasn, DueDt, and Priority fields are the columns recording exactly those characterizations. They are not collateral to BPA's vegetation-management knowledge; they are that knowledge.

The five individually deleted fields (Serial_Nbr and four editor-tracking columns) are even less amenable: Serial_Nbr is the primary key linking records across layers, and the editor-tracking columns record who created and modified each entry. Bovie Rep. 12, 19. "Redundant, obsolete, or sensitive" cannot bear that weight.

The pattern repeats on the transmission-infrastructure layers, with deletions even less amenable to Mr. Beck's rationale. On the Transmission Towers layer, the 26 fields deleted included the primary key *StrcSerialNbr*, *ClimbClearanceViolationInd, StructureElevation*, *OperatingVoltageMeas*, *OperatingLineStatusCd*, structure-type and class codes, maintenance-headquarters assignments, and all four editor-tracking columns. Bovie Rep. 17 (Towers). On the Transmission Spans layer, 20 of 26 fields were deleted.

The deleted Spans fields include the primary key *SerialNbr*, the structural-relationship keys *BackStrcSerialNbr* and *AheadStrcSerialNbr* (which link each span to the towers at either end), *VoltageMeas*, *SpanLengthMeas*, *SpanLengthSpatialMeas*, and *FeetAlongLineMeas*. *Id.* Neither a safety-critical flag nor span-length measurements are plausibly "redundant, obsolete, or sensitive," or redundant with LiDAR point clouds; they are quantitative descriptions of physical infrastructure.

Second, the production exhibits three distinct technical signatures across four layers in a single morning. The Vegetation Encroachments layer was stripped using three methods: five individual *DeleteField* calls (Serial_Nbr and the four editor-tracking columns), a bulk

Page 24 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

*UpdateSchema* operation that removed thirty additional fields in one call, and a final *DeleteField* for the Comment field nine seconds after the bulk operation. Bovie Rep. 11–13. The Transmission Towers and Transmission Spans layers were stripped by sequential individual *DeleteField* commands.

Forty-six removals across the two layers occurred within a five-minute, forty-one-second window between 07:42:14 and 07:47:55. *Id.* at 17 (table). The Substations layer was handled by a third method: BPA selected only four fields in the *ExportFeatures* query, so the unwanted fields were never exported, leaving no *DeleteField* footprint. *Id.* at 18. Three distinct methods deployed in roughly an hour on the same morning reflect considered, layer-specific decisions. The Beck declaration offers a single categorical rationale; the metadata records three considered technical approaches, and the declaration does not engage with that mismatch.

Third, the Bovie Report's conclusions sharpen the point at both the layer and field levels. Mr. Bovie concludes that "[m]odification of data was systematic, occurred on targeted areas of interest, and is captured in the metadata of files produced by BPA." Bovie Rep. 28 (Conclusion 2). The "targeted areas of interest" characterization is borne out by Conclusion 3: "The only file examined which appeared to be unmodified contain[s] data specific to substations located away from potential areas of origin." *Id.* (Conclusion 3).

The pattern is layer-selective at the macro level — substations distant from the ignition area were left untouched, while the Vegetation Encroachments and adjacent transmission-infrastructure layers covering the Cougar-Holden corridor were stripped — and field-selective at the micro level. The Transmission Spans deletions specifically included the structural-relationship keys *BackStrcSerialNbr* and *AheadStrcSerialNbr*, the keys that link each span to the towers at either end. The Transmission Towers deletions included the primary key *StrcSerialNbr*.

Page 25 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

The merits significance is concrete and contested: the *Adams* Plaintiffs allege the fire-causing tree was "near BPA structure 5/2," which the United States denies.

Whether a specific tree in the Vegetation Encroachments layer was near Structure 5/2 is a function of these cross-layer keys, which were stripped before production. A pattern targeted at both the layers most relevant to the Holiday Farm Fire ignition area and the specific fields linking a tree to a specific structure is not consistent with a generic justification of "redundant, obsolete, or sensitive" applied uniformly across the production. It is consistent with selective treatment of the data most relevant to the merits.

Fourth, a record-level pattern remains unaddressed by either declaration. Within the ten surviving columns on the Vegetation Encroachments layer, all 38 records show STATUS = "Corrected," TreeCnt = 1.0, and Entered_By = "LiDAR." Bovie Rep. 14. BPA's source system may have contained vegetation-encroachment records for the Cougar-Holden corridor with other status values such as *Open*, *Deferred*, or *Pending*. If so, those records may have been filtered out at the export step, separate from the field stripping. The *CompleteDt* field that would have verified when each correction was made was deleted on December 19.

In the April re-production the <u>column header returns</u> but <u>all 38 records are blank</u>. The Beck declaration does not address whether the record-level uniformity reflects the actual state of BPA's source data or an additional, record-level filter applied before export. An *Open* or *Deferred* vegetation-encroachment record on the Cougar-Holden corridor pre-dating September 7, 2020, would be probative on the merits in a way that *Corrected* records, by definition, are not. Whether such records existed and what became of them is among the questions the imaging can answer.

Page 26 - ***ADAMS* PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

Fifth, the metadata identifies the user account and workstations through which the stripping was executed; the Beck declaration does not. The expert report records the operations as having been performed under a user account designated "SeanP" on two BPA workstations, CLL5009685 and CDB293583. Bovie Rep. 8–10. The Beck declaration refers throughout to "my team" and "we" without identifying SeanP, naming which team members executed which operations, or connecting the operations on CLL5009685 and CDB293583 to particular personnel.

The declaration also raises a question about authorization. Mr. Beck explains that the unincluded fields on the grow-into analysis layer "are not derived from LiDAR data and generally fall outside the scope of my group and data management." Beck Decl. ¶ 8. He characterizes the vegetation-maintenance observations as data "generally fall[ing] outside the scope of the data managed by my group." *Id.* ¶ 12. If the stripped vegetation-observation fields fell outside the scope of the data managed by Mr. Beck's group, the declaration leaves unaddressed who authorized their removal — identifications material for preservation purposes and for the eventual merits inquiry into <u>who</u> decided what to remove.

The two workstations fall within Paragraph 6's imaging requirement because they hold the local artifacts capable of corroborating or rebutting the Beck account — the ArcGIS Pro Geoprocessing History, ArcMap geoprocessing logs, and local copies of the produced shapefiles and scripts. The Beck declaration cannot foreclose those inquiries; it confirms why the imaging is needed to make them.

Sixth, Mr. Beck's assertion that the modifications were made "only to the data we prepared for production [and] [w]e did not make any changes to the underlying data in the ProjectWise, eGIS, or VMS systems," Beck Decl. ¶ 10, sits awkwardly alongside metadata

Page 27 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

recording four nights of *DisableEditorTracking/EnableEditorTracking* operations on the live

LiDAR_VMS_VegEncroachment source feature class in the four nights immediately preceding

the December 19 export. Bovie Rep. 18–19.

Mr. Gilmour attributes those operations to the automated Locating Job. Gilmour Decl. ¶¶

4–6. That attribution does not address the threshold timing question. A script Mr. Gilmour

describes as running nightly since April 2023 produced exactly four consecutive cycles on this

layer in the four nights immediately preceding its December 19 export, with a uniform 2:43-to-

3:05 disable-to-enable gap. Bovie Rep. 18–19 (table). The metadata records a second cluster

between April 12 and 16, 2026, immediately preceding the April 17 "cure" export. *Id.* at 21.

Whether that correlation is the product of an automated script that happens to have

produced cycles correlated with each production, or of something else, cannot be resolved on the

present record. The answer depends on access to the actual job logs, the script as it was running

on the relevant dates, the SDE archiving *_H* tables for the LiDAR feature classes, and the SQL

Server transaction logs and audit configuration during those windows — all of which fall within

Paragraphs 2 and 6. The neutral forensic imaging is the mechanism for determining which

interpretation is correct.

Seventh, the April 17, 2026 "cure" sharpens the same pattern. Mr. Beck concedes that the

supplemental Transmission Spans file "was identical to the initial production" and characterizes

the cause as inadvertent: "We intended to provide this information in the supplemental

production but it was inadvertently omitted due to human error in exporting the data to the

production set." Beck Decl. ¶ 16. The Bovie finding the concession purports to address is more

specific: the April 17 TransLineSpan file is **byte-for-byte identical** to the December 19 file

except for three bytes recording an internal last-update date. The SHA-256 hashes of

Page 28 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT**
**UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER**
**DATED MAY 8, 2026**

corresponding constituent files match, and the TLSH similarity score is zero across the comparison. Bovie Rep. 19–20.

That is not the signature of inadvertent omission; it is the signature of an artifact reused from the prior production, re-stamped with an April date, and re-sent — meaning the underlying live database was not re-queried for the April supplement on the Spans layer. Whether Mr. Beck's inadvertence framing or the metadata's reuse-and-re-stamp framing is accurate is testable. The April export logs, the ArcGIS Pro Geoprocessing History on the workstations within Paragraph 6's scope, and the SDE archiving state at the relevant times will show whether the live source database was, in fact, re-queried in April. Those artifacts are what Paragraph 6's imaging is designed to preserve. The Beck declaration does not eliminate the questions; it identifies more precisely the artifacts in which the answers are recorded.

The Government cites the declaration for the proposition that the imaging is unnecessary. The declaration's gaps demonstrate the opposite. The questions the declaration leaves open are precisely those Paragraph 6 was designed to resolve, on a record independent of BPA's account of its own systems.

## B. The Gilmour Declaration Reframes the Editor-Tracking Issue Instead of Resolving It.

The Gilmour declaration's central proposition is that the editor-tracking disable/enable cycles documented in the Bovie Report (December 13–18, 2025; April 12–16, 2026) were the product of an automated nightly script — the "Locating Job," running on the eGIS system since approximately April 2023. Gilmour Decl. ¶¶ 5–7. The declaration says the script "disables editor tracking, runs the process, and then re-enables editor tracking," with SDE archiving "still enabled" during the editor-tracking-off window. *Id.* ¶ 6. Mr. Gilmour does not explain the timing correlation discussed in Section IV.A. Namely, exactly four consecutive cycles immediately

Page 29 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

preceded the December 19, 2025 export, and five immediately preceded the April 17, 2026 export. The script's longevity is not an answer to why its execution clustered, by every available measure in the metadata, in the days immediately preceding two productions of the very layer it affects. Mr. Gilmour acknowledges only that the timing and duration of the events "immediately suggests an automated process." *Id.* ¶¶ 4, 8.

A further problem is internal to the Gilmour declaration. Mr. Gilmour states that the Locating Job "reads the Vegetation Encroachment layer, runs a process to identify the nearest transmission line span, and updates data in a separate dataset called LiDAR_VMS_VegEncroachment_PowerBI," and that execution "does not update or modify the LiDAR_VMS_VegEncroachment source data." *Id.* ¶ 5. If so, there would be no reason for the script to disable editor tracking on the Vegetation Encroachments source feature class at all. Editor tracking, as Mr. Gilmour describes it, "maintains a record of the editor who created or modified the data and a time stamp of when the edit occurred," written onto the records that are edited. *Id.* ¶ 3.

The prophylactic disablement is only relevant where edits to records bearing those tracking fields are about to occur. The script's disabling of editor tracking on the Vegetation Encroachments source layer is itself evidence that the process writes to that feature class, not merely to its PowerBI derivative — a technical question Paragraph 6's imaging can resolve.

**C. The Locating Job Has Continued To Run on the Protected Feature Class After the Order, and Was Not Disclosed Until May 13, 2026.**

The Locating Job, on Mr. Gilmour's description, has run since 2023. According to the Government's own counsel, it continued to run after entry of the Order on May 8, 2026. The *Adams* Plaintiffs were not informed of that fact until May 13, 2026, when DOJ counsel wrote to

Page 30 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

characterize it as "an urgent issue … regarding [BPA's] ability to comply with the TRO." Krieger email of May 13, 2026, 1:26 p.m. PT.

Five nights of the Locating Job had run between entry of the Order and that first disclosure to plaintiffs' counsel. The Joint Motion to Modify filed the prior day (ECF 261) did not identify the Locating Job by name. Its modification proposed only that BPA be permitted ordinary-course database operations "so long as the databases' audit tracking systems remain in place and operational." That language is in the modified Order today.

The Government's present position is that the Locating Job is permitted by the modified Paragraph 3 because "the processes at issue disable editor trackers, not audit trackers," and the SQL Server Audit subsystem remains on. Krieger email of May 13, 2026, 4:06 p.m. PT. The position is difficult to reconcile with the modification the Government negotiated, for three reasons.

First, modified Paragraph 3's first sentence, preserved verbatim from the original, enumerates "changes to editor-tracking settings" as a prohibited operation. The Locating Job's first and third steps are, by Mr. Gilmour's description, changes to editor-tracking settings. The second sentence's carve-out for ordinary-course database use cannot be read to permit conduct the first sentence specifically prohibits without rendering its enumeration surplusage. Cf. *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (courts are "reluctant to treat statutory terms as surplusage" "in any setting").

Second, the carve-out's term is plural: "audit tracking systems." The Order treats SQL Server Audit (engine-level logging, preserved under Paragraph 2(a)) and the geodatabase-layer tracking mechanisms (editor tracking, archiving _H tables, and versioning A/D tables, preserved under Paragraph 2(b)) as separate categories of preservation. The natural reading is that "audit

Page 31 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT**
        **UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER**
        **DATED MAY 8, 2026**

tracking systems" refers to those systems collectively. Paragraphs 2(c) and 2(d) refer expressly to "the nine editor-tracking disabled windows," making clear that editor tracking is the specific subsystem the Order is designed to protect. Order ¶ 2 (ECF 256).

Third, the Joint Motion was negotiated precisely because the original Paragraph 3 prohibited the Locating Job's editor-tracking cycling. If the modified Paragraph 3 were read to permit editor-tracking-off, the modification would have authorized the very conduct it was negotiated to constrain — rendering the joint modification a nullity, which the parties' conduct in seeking it belies.

The *Adams* Plaintiffs do not raise this as a contempt application, and the Court need not adjudicate compliance to deny the motion. The Government argues the Court can dissolve the Order because "the concerns raised by the *Ex Parte* Motion have been addressed." Mot. 15. On the Government's own description of facts disclosed only on May 13, the protected feature classes have been subject to a nightly automated process that cycles editor tracking and writes to source data every night since the Order entered. Whether that process modifies the source records, and whether SDE archiving captures what editor tracking would otherwise have captured during those windows, are exactly the questions Paragraphs 2 and 6 were designed to answer. The proposition that those concerns are "addressed" requires that the imaging be completed and the artifacts examined — not that the Order producing them be dissolved.

**D.  The Iron Mountain Backups, the BPA Snapshot, and the BPA-Conducted Workstation Imaging Are Not Substitutes for the Imaging.**

The Government's remaining "addressed" argument is that "[t]he data has been preserved" by three artifacts: the May 11 BPA "snapshot" of the eGIS system; the Iron Mountain backups extending to May 2022; and, implicitly, BPA's own imaging of the two workstations the

Page 32 -  *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT
UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER
DATED MAY 8, 2026**

Order identifies. Mot. 16 (citing Dickson Decl. ¶¶ 6, 9, 16); Dickson Decl. ¶ 13. Each has its place; none is a substitute for the neutral forensic image Paragraph 6 prescribes.

The Government's threshold argument — that BPA's existing backups make preservation of the source database unnecessary, Mot. 11, and that any need to find "lost" data or show alteration "could easily be done by comparing the present state of the system . . . to one of the backups," Mot. 16 — does not match the questions Paragraph 6 was entered to answer.

Backups are intermittent point-in-time captures. The Iron Mountain inventory, as the United States Attorney's May 11 cover letter describes it, shows tape backups "stored off-site with a third-party vendor, Iron Mountain" dating to May 2022. Letter from S. Luse to Counsel, May 11, 2026 (TRO Inventory Cover Letter). The tapes may capture the state of the eGIS source databases at the time each backup was created; they cannot show what was in the live source database *during* the nine editor-tracking-disabled windows, because they were not taken during those windows. The artifacts that would speak to those windows — transaction logs, SDE archiving _H tables, audit configurations, and the script-execution logs Mr. Gilmour describes — are not preserved in periodic tape backups. *See* Bovie Rep. 21–22; Dickson Decl. ¶ 9. Backup comparison would tell the parties what the database looked like at backup time; the question is what was modified between those captures, and whether SDE archiving captured what editor tracking would otherwise have recorded. Mr. Dickson concedes that the tapes "could be overwritten or deleted," though he represents that individual tape contents cannot be altered. *Id.* The tapes' protection depends on BPA's continued enforcement of Iron Mountain's chain of custody and the litigation hold.

The BPA snapshot of May 11–12, 2026, has a different and more fundamental problem. Mr. Dickson describes it as "initiated" on May 11 and representing the system state "at the time

Page 33 -  *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

it completed on May 12, 2026." *Id.* ¶ 10. By the time it completed, the Locating Job had already run on the protected feature class on the evenings of May 8, 9, 10, and 11 — the automated process the Government did not disclose to plaintiffs' counsel until May 13. See Section IV.C above.

The snapshot accordingly captures the system in a state already affected by post-Order operations whose forensic significance is itself contested. A snapshot prepared by the party whose conduct gave rise to the Order, on a system already subject to undisclosed post-Order operations, is not an answer to the questions Paragraph 6 was entered to permit the Court to ask. See *Playboy Enters., Inc. v. Welles*, 60 F. Supp. 2d 1050, 1054–55 (S.D. Cal. 1999) (where defendant's deletion conduct gave rise to need for forensic imaging, court appointed neutral computer specialist "as an Officer of the Court" to create mirror image, rejecting argument that party-paid examiner would be an "agent" of the paying party).

BPA's own imaging of the two workstations identified in Paragraph 6 illustrates the same point. On May 11, 2026, BPA's "Cyber Security Forensics & Intelligence team" imaged workstations CLL5009685 and CDB293583 using "Axiom Cyber," storing the resulting images, log files, hash values, and BitLocker recovery keys on a "secured network file share with access restricted to BPA's Cyber Security Forensics & Intelligence team." Dickson Decl. ¶ 13. The *Adams* Plaintiffs do not question that BPA's Cyber Forensics team performed competent imaging. But the integrity of forensic work product is no substitute for independence in its creation and custody.

The neutral examiner contemplated by Paragraph 6 is meant to image the workstations under the examiner's control, retain the images, and place them under seal pending the preliminary-injunction hearing. The BPA imaging substitutes party control at every step: BPA

Page 34 - ***ADAMS* PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

performed the imaging, BPA selected the tool, and the images sit behind BPA-controlled access. Each step is what Paragraph 6 was structured to displace. The neutral imaging is not duplicative of what BPA has done; it is independent of it.

## V.  THE ALTERNATIVE REQUEST TO POSTPONE THE PRELIMINARY-INJUNCTION HEARING SHOULD BE DENIED

The Government's alternative request is that the Court "postpone the preliminary injunction hearing currently scheduled for May 21-22, 2026, and set a briefing schedule." Mot. 17–18. The request seeks additional time during which the operative provisions of the Order, in particular Paragraph 6's imaging, would not be enforceable while no preliminary injunction is in place to replace them.

Rule 65(b)(2) limits a TRO issued without notice to fourteen days from entry, absent the adverse party's consent. The Order entered May 8, 2026 (5:42 p.m.); the fourteen-day limit reaches May 22, 2026. The preliminary-injunction hearing the Court set for May 21–22 fits within that window. The Government's framing of that hearing as "untimely under … Rule 65(b)(3)," Mot. 18, has the rule backwards. Rule 65(b)(3) requires that the preliminary-injunction motion be set "at the earliest possible time," but recognizes that the schedule must accommodate the parties' respective rights to be heard. The Court's scheduling did that. Postponing the hearing past the May 22 TRO expiration would functionally dissolve the Order through delay, in the very window in which BPA's ongoing conduct on the protected systems is most plausibly subject to scrutiny.

The Government's secondary contention — that the original Order's 48-hour and 7-day deadlines required an earlier hearing (Mot. 18) — is moot. Those deadlines were modified by the Joint Motion the Government itself negotiated, ECF 261, granted on May 14 (ECF 264), to

Page 35 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

accommodate the Government's operational constraints. The Government cannot now invoke the original deadlines to postpone the hearing the modified schedule was structured to reach within the Rule 65(b)(2) window.

The Government complains that it does not "know precisely what is being sought, both in terms of evidence and relief," at the preliminary-injunction hearing. Mot. 3. The *Adams* Plaintiffs are content to identify their proposed preliminary relief in advance of the hearing on a schedule the Court may set. Any such process question — the timing of an opening brief, the scope of evidence, or the form of presentation — is readily resolved without disturbing the Order. If the Court considers a status conference, the *Adams* Plaintiffs respectfully request that any such conference be in addition to, not in lieu of, the May 21–22 hearing, with the Order remaining in force through any rescheduled date.

## VI.  NO SECURITY IS REQUIRED

The Order's Paragraph 8 finding that "[n]o security is required under Rule 65(c), as this Order requires the United States to do no more than comply with its existing duty to preserve evidence in pending litigation," is correct on the law and the facts.

Rule 65(c) confides the amount of security to the Court's discretion. The Ninth Circuit recognizes the court's "discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); accord *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003); *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011). That discretion is particularly appropriate where the order requires only what existing law independently requires. The Order's preservation provisions in Paragraphs 1–5 fall comfortably within BPA's existing duties — duties arising under this Court's prior orders, federal records-

Page 36 - *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

preservation law (44 U.S.C. § 3106; 18 U.S.C. § 2071), federal information-security law (FISMA, 44 U.S.C. §§ 3551–3558; NIST SP 800-53 AU controls), and the common-law duty to preserve evidence reasonably anticipated to be relevant to litigation.

As to Paragraph 6's forensic imaging, the Order itself anticipated cost: "The cost of the imaging shall initially be borne by the United States, subject to reallocation at the preliminary-injunction hearing." Order ¶ 6. The Government has not asked the Court to reallocate or to set a bond; it asks instead for the imaging to be foreclosed altogether. The Court can address cost questions at the May 21–22 hearing on a developed record, with the imaging completed (or in progress) and the actual costs known. Dissolving the Order on the strength of a vendor estimate received the day before the motion was filed is not the appropriate course.

## VII.  CONCLUSION

The Government has identified no defect in the May 8 Order that warrants dissolution. The forensic record establishing the December 19 stripping and the April 17 non-cure is undisputed. The Government's contemporaneous correspondence characterized the underlying matter as a "potential discovery dispute" requiring resolution; the patch the Government offered did not patch the most damaged layer; the declarations leave unaddressed who within BPA decided what to remove, on what authority, and why the deletions tracked the data most relevant to the merits; and the Locating Job has continued to run nightly on the protected feature class since the Order entered. The neutral forensic imaging Paragraph 6 prescribes is the minimum necessary mechanism for resolving those questions on a record independent of BPA's representations about its own systems.

Page 37 -  *ADAMS* **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISSOLVE THE COURT'S ORDER DATED MAY 8, 2026**

The *Adams* Plaintiffs respectfully request that the Court deny the Motion to Dissolve in its entirety, deny the alternative request to postpone the preliminary-injunction hearing, and proceed with the May 21–22, 2026 hearing as scheduled.

Dated: May 18, 2026.

**Rick Klingbeil, P.C.**
/s/ Rick Klingbeil

_____

Rick Klingbeil
Of Attorneys for *Adams* Plaintiffs