SCOTT E. BRADFORD
United States Attorney
District of Oregon
SUSANNE LUSE
Assistant United States Attorney
Susanne.Luse@usdoj.gov
United States Attorney's Office
District of Oregon
1000 SW Third Ave., Suite 600
Portland, Oregon 97204
Telephone: (503) 727-1000

BRETT A. SHUMATE
Assistant Attorney General
PHILIP D. MACWILLIAMS
Director, Torts Branch
GRANT E. TREASTER
Assistant Director, Torts Branch
ARI NAZAROV
Trial Attorney, Torts Branch
JOCELYN KRIEGER
Trial Attorney, Torts Branch
BRENT M. PHIPPS
Trial Attorney, Torts Branch
*Attorneys for Defendant United States of America*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

| | |
|---|---|
| **21st CENTURY CENTENNIAL INS. CO, *et al.*,**<br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA, *et al.*,**<br><br>Defendants. | Case No. 6:24-cv-00089-MTK (Lead Case)<br>Case No. 6:24-cv-00092-MTK<br>Case No. 6:24-cv-00203-MTK<br>Case No. 6:24-cv-01152-MTK<br>Case No. 6:24-cv-01559-MTK<br>Case No. 6:25-cv-00554-MTK<br><br>**DEFENDANT UNITED STATES OF AMERICA'S ANSWER TO ALLARD PLAINTIFFS' SECOND AMENDED COMPLAINT** |

Defendant United States of America ("Defendant"), by Scott E. Bradford, United States Attorney for the District of Oregon, through Susanne Luse, Assistant United States Attorney, respectfully submits this Answer to the Allard Plaintiffs' Second Amended Complaint filed in *Allard, et al. v. United States, et al.,* Case No. 6:24-cv-00203-MTK (D. Or.), ECF 255.

Defendant's Answer fully incorporates Plaintiffs' numbered paragraphs and Defendant's responses are emphasized in bold font. Defendant's responses address specific allegation(s) in each paragraph or, when following the paragraph, respond to the numbered allegation in its entirety. Defendant admits, denies and alleges as follows:

**INTRODUCTION**

1. This Complaint arises from the Holiday Farm Fire, which Defendants' powerlines caused on September 7, 2020, in Lane County, Oregon.

**Paragraph one is a characterization of the complaint that does not require a response. To the extent a response is required, the United States denies that its powerlines caused the Holiday Farm Fire.**

2. In the days leading up to September 7, 2020, the National Weather Service ("NWS") issued numerous dire warnings about unusually dangerous weather conditions expected to strike Oregon. The NWS predicted hot, dry winds from the east that could exceed 60 miles per hour for the evening of September 7th. It repeatedly warned that these conditions would create the perfect environment for wildfires. It even issued the rare "extremely critical" designation, which is reserved only for when forecasters are confident of extremely dangerous wildfire conditions. In response to these warnings, many utilities in Oregon de-energized power lines when the winds started on September 7, 2020. Their decisions saved lives and spared property.

**The first four sentences in Paragraph two purport to characterize the content of statements by the National Weather Service. The statements speak for themselves and are the best evidence of their contents. To the extent the allegations in Paragraph two are inconsistent with the referenced statements or otherwise taken out of context, the United States denies the allegations. The fifth sentence in Paragraph two is vague, and the United States denies it on that basis. The United States lacks knowledge or information sufficient to admit or deny the allegations in the last sentence of Paragraph two and therefore denies them.**

3. The defendants in this action, the United States, Eugene Water & Electric Board ("EWEB"), and Lane Electric Cooperative, Inc. ("LEC") (collectively "Defendants"), knew about the extreme threat of wildfires on the evening of September 7.

**The allegations in Paragraph three are vague, and the United States denies them on that basis.**

4. They also knew that under the weather conditions on that day continuing to energize their power lines, or re-energizing their power lines too soon, would create an extreme risk, if not a certainty, of wildfires. Indeed, all of their websites have acknowledged that de-energizing their power lines reduces the risk of fire. But unlike other utilities, the United States, EWEB, and LEC intentionally continued to energize the power lines they owned, operated, or controlled despite the extreme fire risk, so that they could continue providing electricity to the public. Defendants United States and EWEB also failed to remove trees that, because of the likelihood that wind would cause

the trees to fall onto power lines and ignite a fire, posed a danger to those power lines and to the public.

**The United States denies the allegations in the first sentence of Paragraph four. The allegations in the second and third sentences in Paragraph four are vague, and the United States denies them on that basis. To the extent Plaintiffs seek to assert negligence against the United States based upon a failure to de-energize power lines, such claim is barred by the law of the case, as the Court has ruled that it lacks subject matter jurisdiction on those claims and has dismissed the claims with prejudice. See Order. 6:24-cv-00089, ECF No. 194.**

5. When the strong, dry winds arrived on the evening of September 7, 2020, multiple trees that the United States and EWEB should have removed fell onto their power lines and/or onto power lines located on their land; the power lines ignited surrounding vegetation; and the ignitions quickly grew into uncontrollable wildfires that merged and created the Holiday Farm Fire.

**The United States denies the allegations in Paragraph five.**

6. The resulting fire in the Holiday Farm area was devastating. Over 170,000 acres burned. Hundreds of homes, schools, and businesses were destroyed. People's priceless possessions were incinerated. Their beloved pets and other animals suffered horrific deaths. For some, everything they had spent a lifetime gathering was lost. The wedding ring from their grandmother ruined. Their child's first set of shoes blackened beyond recognition. Irreplaceable pictures left in ashes.

**The first sentence in Paragraph six is vague, and the United States therefore denies it. In response to the second and third sentences, the United States admits the Holiday Farm Fire affected over 170,000 acres and caused property damage. The United States lacks**

**knowledge or information or belief sufficient to admit or deny the remaining allegations in Paragraph five and therefore denies them.**

7. Another inevitable consequence of the fire that Defendants' intentional conduct caused was that many people, including Plaintiffs, who were in the area that the fire impacted, suffered serious ongoing personal injuries as a result of wildfire smoke, including harm to the heart, lungs, and other vital organs, and increased risk of stroke, heart attacks and respiratory problems. And all because Defendants continued to energize power lines they owned, operated, or controlled, and/or failed to remove dangerous trees.

**The allegations in Paragraph 7 regarding "Defendant's intentional conduct" and what it caused are legal conclusions that do not require a response. To the extent a response is required, the United States denies those allegations. The United States lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph six.**

8. Plaintiffs now sue Defendants to recover damages for some of the harm they suffered. They make the allegations in this complaint based on personal knowledge, information and belief, and/or the investigation and research of counsel.

**Paragraph eight is a characterization of the complaint that does not require a response. The United States denies that plaintiffs are entitled to any recovery from the United States.**

## PARTIES

### I. Plaintiffs

9. Plaintiffs are individuals, representatives, and legal entities. At all times relevant to this pleading, Plaintiffs were homeowners, renters, business owners, residents, and occupants of real

property located in Lane County, and/or had a property interest located therein. The Holiday Farm Fire injured Plaintiffs personally, interfered with their personal rights and interests in their property, and/or destroyed or damaged their property.

**The United States lacks knowledge or information sufficient to admit or deny the allegations in paragraph nine and therefore denies them.**

10. Plaintiffs have elected to join their individual lawsuits in a single action under rules of permissive joinder as set forth in Rule 20(a)(1) of the Federal Rules of Civil Procedure. Plaintiffs do not seek class certification or relief on any collective basis. Instead, they seek damages and other remedies on an individual basis.

**Paragraph 10 is a characterization of the complaint that does not require a response. The United States denies that plaintiffs are entitled to any recovery from the United States.**

11. The Holiday Farm Fire was ignited on September 7, 2020, and was extinguished no sooner than October 29, 2020.

**In response to the allegations in Paragraph 11, the United States admits the Holiday Farm Fire began on September 7, 2020. The United States lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 10 and therefore denies them.**

12. The Plaintiffs listed on Exhibit A (hereafter the "FTCA Plaintiffs"), have complied with the notice requirement of the Federal Tort Claims Act, 28 U.S.C. § 2401(b). They gave the United States formal and actual notice of their claims on September 1, 2022, or on December 5, 2023.

**The first sentence of Paragraph 11 consists of legal conclusions that do not require a response. The allegations in the second sentence of Paragraph 11 are vague, and the United States therefore denies them.**

13. The Plaintiffs listed on Exhibit B (hereafter the "OTCA Plaintiffs") have complied with ORS 30.275's 180-day notice requirement for actions against public entities, as amended by Executive Order 20-03, House Bill 4212, and Executive Order 21-15, by giving EWEB formal and actual notice of their claims on the following dates in 2021: April 16, June 2, August 14, September 24, and September 28.

**The United States lacks knowledge or information sufficient to admit or deny the allegations in paragraph 13 and therefore denies them.**

**II. Defendants**

14. Defendant United States, through the Bonneville Power Administration (BPA), owns and operates power lines and other electric equipment and infrastructure ("electric utility infrastructure") in various locations, including in the Holiday Farm area in Oregon. BPA is an agency within the Department of Energy of the United States, based in the Pacific Northwest with its Administrator and office headquarters located in Portland, Oregon, as established pursuant to the Bonneville Project Act of 1937, 16 U.S.C. § 832(a). Defendant United States, through the United States Forest Service (USFS), owns and/or manages the Willamette National Forest in Oregon. USFS is an agency within the Department of Agriculture of the United States.

**The United States admits the allegations in Paragraph 14.**

15. EWEB is an Oregon Corporation doing business as a public utility in Oregon. EWEB's primary place of business is at 500 East Fourth Avenue, Eugene, Oregon 97401. It conducts regular, sustained business in Oregon. It owns and/operates electric utility infrastructure in Oregon to transmit, supply, and provide electricity to public and private consumers. EWEB is a public entity.

**The United States admits the allegations in Paragraph 15.**

16. LEC is an Oregon Corporation doing business as a public utility in Oregon. LEC's primary place of business is at 787 Bailey Hill Road, Eugene, Oregon, 97402. It conducts regular, sustained business in Oregon and Lane County. It owns and operates electric utility infrastructure in Oregon to transmit, supply, and provide electricity to public and private consumers.

**The United States admits the allegations in Paragraph 16.**

## JURISDICTION AND VENUE

**17.** Jurisdiction is proper in this Court with respect to claims against the United States pursuant to 28 U.S.C. § 1346(b) because the claims seek to impose liability for the negligent or wrongful acts or omissions of United States employees acting within the scope of their official duties.

**The United States denies this Court has jurisdiction for the reasons including, but not limited to, those more fully set forth in its previously filed Motion to Dismiss.**

18. Jurisdiction is proper in this Court with respect to claims against EWEB and LEC under 28 U.S.C. § 1367 because the claims against EWEB and LEC are so related to the claims against the United States that they form part of the same case or controversy.

**The United States denies this Court has jurisdiction for the reasons including, but not limited to, those more fully set forth in its previously filed Motion to Dismiss.**

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events and omissions giving rise to the claims occurred within this judicial district, and all Defendants own and operate electrical utility infrastructure in this judicial district.

**The United States admits that venue is proper.**

## ALLEGATIONS

### I. Defendants have a duty to safely maintain and operate their electric utility infrastructure.

20. Defendants supply electricity in the Holiday Farm area. They own, operate, maintain, and repair electric utility infrastructure that transmits electricity to utility customers and to residents, businesses, schools, and industries in Oregon, including in and around the ignition points of the Holiday Farm Fire.

**In response to the first sentence in Paragraph 20, the United States admits that BPA transmits electricity in the Holiday Farm area. The allegations in the second sentence of Paragraph 20 are vague, and the United States denies them on that basis.**

21. Operating high-voltage electric equipment as part of an electric utility infrastructure carries inherent dangers. The inherent and heightened danger associated with the transmission and distribution of electricity through overhead power lines in vegetated areas requires Defendants to exercise care to protect the public and the communities in which their electric utility infrastructure

operates. Moreover, Defendants have a level of expertise about the operation of electric utility infrastructure far beyond that of a layperson.

**The United States admits the allegations in the first sentence of Paragraph 21. The allegations in the second and third sentences of Paragraph 21 are vague, and the United States denies them on that basis.**

22. Oregon lawmakers recognize that Defendants' electric utility infrastructure poses real and significant fire threats. As Governor Kate Brown's Wildfire Council stated in its Recommendations on Utility Preparedness: "As the frequency, intensity and duration of wildfires has increased in the West, there is a need to have electrical companies take measures to reduce the risk of these events. For example, powerline fires are on average ten (10) times larger than fires from other causes."

**The allegations in Paragraph 22 purport to characterize the content of statements by Governor Kate Brown's Wildfire Council. The statements speak for themselves and are the best evidence of their contents. To the extent the allegations in Paragraph 22 are inconsistent with the referenced statements or otherwise taken out of context, the United States denies the allegations.**

23. Defendants have a duty to adequately operate, monitor, maintain, and repair their electric utility infrastructure, and the electric utility infrastructure they operate for others, to ensure that they do not cause fires. This duty includes not continuing to energize their power lines during periods of critical fire risk to prevent fires and to allow first responders to safely access ignited areas to put out fires. Defendants' duty also includes not allowing anything around their

infrastructure and equipment (including land, vegetation, objects, and structures) to exist, develop, or grow, such that it is likely to come into contact with their electric utility infrastructure in such a way as to cause a fire or otherwise endanger the public. In addition, as a landowner, the United States has a duty to safely maintain the land on which it allows electrical utility infrastructure and equipment to be located and operated. This duty includes not allowing anything around that infrastructure and equipment to exist, develop, or grow, such that it is likely to come into contact with the infrastructure and equipment in such a way as to cause a fire or otherwise endanger the public.

**The allegations in paragraph 24 state legal conclusions that do not require a response. The United States can be liable only as set forth in the Federal Tort Claims Act, 28 U.S.C. 1346(b), 2671-2680.**

**II. Defendants knew about the extreme fire risk on Labor Day 2020.**

24. Due in part to extreme drought conditions as designated in the U.S. Drought Monitor on both sides of the Cascade Mountains through 2020, fire potential was well above normal levels at the beginning of September 2020.

**The allegations in Paragraph 24 are vague, and the United States denies them on that basis.**

25. Starting on Wednesday, September 2, 2020, the NWS began issuing warnings about dangerous weather conditions for fires in Oregon. The NWS noted that beginning on Monday, September 7, 2020—Labor Day—there would be gusty offshore winds leading to “fire weather concerns[.]”

**The allegations in Paragraph 25 purport to characterize the content of statements by the National Weather Service. The statements speak for themselves and are the best evidence of their contents. To the extent the allegations in Paragraph 25 are inconsistent with the referenced statements or otherwise taken out of context, the United States denies the allegations.**

26. On Friday, September 4, 2020, the NWS continued to issue warnings about the weather that would begin the following Monday. The NWS predicted winds of a magnitude that one would expect to see "once every 30 years." The NWS warned that, as "a result . . . fire weather concerns abound." The NWS recognized that this was "an unusual amount of lead time for a watch[.]" But because of "the high level of confidence in a strong east wind event," the NWS felt it was "prudent to give fire officials as much time to prepare as possible." The NWS urged "extreme caution[.]" In issuing this warning, the NWS specifically identified geographic areas of concern, including an area that covered the Holiday Farm area. It also again identified "Monday evening" as when the extreme winds would begin and create the "potential to see rapid fires spread[.]"

**The allegations in Paragraph 26 purport to characterize the content of statements by the National Weather Service. The statements speak for themselves and are the best evidence of their contents. To the extent the allegations in Paragraph 26 are inconsistent with the referenced statements or otherwise taken out of context, the United States denies the allegations.**

27. On Saturday, September 5, 2020, the NWS issued a "Red Flag Warning" that would begin at noon on Monday (Labor Day) and end at 10:00 p.m. on Tuesday and predicted extreme winds between 35 and 50 miles per hour. The NWS issues a "Red Flag warning" when "warm

temperatures, very low humidities, and stronger winds are expected to combine to produce an increased risk of fire danger."

**The allegations in Paragraph 27 purport to characterize the content of statements by the National Weather Service. The statements speak for themselves and are the best evidence of their contents. To the extent the allegations in Paragraph 27 are inconsistent with the referenced statements or otherwise taken out of context, the United States denies the allegations.**

28. On Sunday, September 6, 2020, the NWS reiterated that there were "many concerns" about the winds beginning Monday evening. Among those concerns was "the extreme fire danger[.]" And by Sunday evening, the NWS identified 8:00 p.m. Monday through 1:00 p.m. Tuesday as the most concerning period.

**The allegations in Paragraph 28 purport to characterize the content of statements by the National Weather Service. The statements speak for themselves and are the best evidence of their contents. To the extent the allegations in Paragraph 28 are inconsistent with the referenced statements or otherwise taken out of context, the United States denies the allegations.**

29. The NWS continued to issue warnings in the days and hours leading up to the evening of Monday, September 7. On the morning of September 7, 2020, the NWS informed the public that they were on "track for an extremely dangerous period of fire weather[.]" Winds were expected to reach speeds of 60 to 80 miles per hour. The conditions put much of Oregon—including the Holiday Farm area—in the "Extremely Critical" category. This rare category is reserved for situations in which forecasters are confident about extremely dangerous wildfire conditions on a

given day. Before September 7, 2020, the NWS had placed Oregon in this category only twice before, in the summer of 2000. Thus, by the morning of September 7, Defendants knew that there was an extreme fire risk throughout Oregon, including in the Holiday Farm area.

**The allegations in the first four sentences of Paragraph 29 purport to characterize the content of statements by the National Weather Service. The statements speak for themselves and are the best evidence of their contents. To the extent the allegations in Paragraph 29 are inconsistent with the referenced statements or otherwise taken out of context, the United States denies the allegations. The United States lacks knowledge or information sufficient to admit or deny the allegations in the fifth and sixth sentences of Paragraph 29 and therefore denies them. The allegations in the last sentence of Paragraph 29 are vague, and the United States therefore denies them.**

30. On the evening of September 7, 2020, at about 8:00 p.m., Governor Kate Brown's chief of staff organized a call that included several electric utilities, including BPA. During that call, Doug Grafe, Chief of Fire Protection of the Oregon Department of Forestry ("ODF"), advised the utilities to de-energize their lines to prevent ignition of additional wildfires.

**In response to the allegations in the first sentence of Paragraph 30, the United States admits that Governor Kate Brown's office organized a call in the evening on September 7, 2020, to discuss weather conditions, and that a BPA representative participated in the call. The United States denies the allegations in the second sentence of Paragraph 30.**

**III. Defendants knew what to do to prevent wildfires during extreme weather conditions.**

31. Well before the ODF advised the utilities to cease energizing their power lines on Labor Day 2020, Defendants knew that ceasing to energize power lines was an effective way to prevent wildfires during periods of elevated fire danger, including during high wind events.

**The allegations in Paragraph 31 are vague, and the United States therefore denies them. To the extent Plaintiffs seek to assert negligence against the United States based upon a failure to de-energize power lines, such claim is barred by the law of the case, as the Court has ruled that it lacks subject matter jurisdiction on those claims and has dismissed the claims with prejudice. See Order. 6:24-cv-00089, ECF No. 194.**

32. As early as 2013, electric utilities on the West Coast had adopted plans requiring intentional temporary outages to prevent fires. BPA's 2020 Wildfire Mitigation Plan (page 15) identified "de-energization of lines during certain conditions" as one of the "activities that address wildfire risk factors."

**The allegations in the first sentence of Paragraph 32 are vague, and the United States therefore denies them. The allegations in sentence two of Paragraph 32 purport to characterize the content of BPA's Wildfire Mitigation Plan. The document speaks for itself and is the best evidence of its contents. To the extent the allegations in Paragraph 32 are inconsistent with the Wildfire Mitigation Plan or otherwise taken out of context, the United States denies the allegations. To the extent Plaintiffs seek to assert negligence against the United States based upon a failure to de-energize power lines, such claim is barred by the law of the case, as the Court has ruled that it lacks subject matter jurisdiction on those claims and has dismissed the claims with prejudice. See Order. 6:24-cv-00089, ECF No. 194.**

33. By September 7, 2020, it was the generally accepted practice for electric utilities on the West Coast to have a plan to de-energize their power lines during the conditions that existed on the evening of September 7, 2020. Indeed, many utilities in Oregon de-energized their power lines in anticipation of the high winds that blew through on Labor Day 2020. Pacific Power, one of the utilities that failed to do so, has already been found liable by an Oregon jury for the wildfires its power lines caused.

**The United States denies the allegations in the first sentence of Paragraph 33. The allegations in the second and third sentences of Paragraph 33 are vague, and the United States therefore denies them. To the extent Plaintiffs seek to assert negligence against the United States based upon a failure to de-energize power lines, such claim is barred by the law of the case, as the Court has ruled that it lacks subject matter jurisdiction on those claims and has dismissed the claims with prejudice. See Order. 6:24-cv-00089, ECF No. 194.**

34. EWEB's website makes a similar statement regarding de-energizing power lines. On April 8, 2021, the "Wildfire and Safety Prevention" page of EWEB's website stated: "When there is a high risk for a wildfire, we may temporarily shut off power to certain neighborhoods to prevent our electric utility infrastructure from becoming the source of an ignition." In making the decision whether to deenergize its power lines, EWEB stated that it looked at whether there is a "Red Flag Warning" by the NWS; whether the forecast called for "[s]ustained winds over 20 mph and gusts above 30 mph"; whether there were humidity levels under 20 percent; and whether there was "[d]ry [m]aterial on the [g]round." As EWEB knew, all these factors mandated that it de-energize its power lines on the evening of September 7, 2020.

**The United States lacks information or belief sufficient to admit or deny the allegations in Paragraph 34 and therefore denies them. To the extent Plaintiffs seek to assert negligence against the United States based upon a failure to de-energize power lines, such claim is barred by the law of the case, as the Court has ruled that it lacks subject matter jurisdiction on those claims and has dismissed the claims with prejudice. See Order. 6:24-cv-00089, ECF No. 194.**

35. LEC's website states: "We do not take power shutoffs lightly and do so when there's fire danger (temperature, relative humidity, wind) and physical threats to the safety of our communities." As LEC knew, all these factors compelled it to de-energize its power lines on the evening of September 7, 2020. IV. Defendants' actions and inactions predictably and inevitably led to a fire igniting during the evening of September 7, 2020.

**The United States lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 34 and therefore denies them. To the extent Plaintiffs seek to assert negligence against the United States based upon a failure to de-energize power lines, such claim is barred by the law of the case, as the Court has ruled that it lacks subject matter jurisdiction on those claims and has dismissed the claims with prejudice. See Order. 6:24-cv-00089, ECF No. 194.**

36. There were three ignition points of the Holiday Farm Fire. The first ignition occurred on the evening of September 7, 2020, at approximately 5:25 p.m. near pole 5/2 on BPA's Cougar–Holden line when one or more trees that the United States should have removed crashed onto the line and ignited a fire.

**The United States lacks knowledge or information sufficient to admit or deny the allegations in the first sentence of Paragraph 36 and therefore denies them. The United States denies the allegations in the second sentence of Paragraph 36.**

37. The second ignition occurred at approximately 8:10 p.m. on September 7, 2020, near mile post 47 of Highway 126, when one or more trees that both EWEB and the USFS should have removed fell on an EWEB line on the south side of the highway. The fallen trees caused EWEB's line to sag onto LEC's line.

**In response to the first sentence in Paragraph 37, the United States admits only that the Holiday Farm Fire began at approximately 8:10 p.m. on September 7, 2020, near mile post 47 of Highway 126 due to powerlines owned and operated by EWEB and/or LEC. The allegations in the second sentence of this paragraph are vague, and therefore the United States denies them.**

38. EWEB's line was de-energized, but immediately after it contacted LEC's line, which was energized, EWEB's line became re-energized, and EWEB's re-energized line ignited the fallen trees and other vegetation with which it was already in contact.

**The United States admits the allegations in Paragraph 38.**

39. The third ignition occurred at approximately 8:25 p.m. on September 7, 2020, near pole 6/1 east of the Blue River Tap on BPA's Cougar-Holden line, where one or more trees that the United States should have removed crashed onto the line. At the time the tree(s) fell, BPA's Cougar-Holden line was de-energized east of the Blue River Tap. However, it became re-energized after EWEB's line became re-energized; EWEB's re-energized line was able to carry current back to the pole 6/1 ignition point because the AS-1051 disconnect had not been opened. BPA's re-

energized Cougar-Holden line ignited the fallen trees and other vegetation with which it was already in contact near pole 6/1.

**The United States denies the allegations in the first sentence of Paragraph 39. In response to the allegations in the second sentence of Paragraph 39, the United States admits that BPA's Cougar-Holden line remained de-energized east of the Blue River Tap at 8:25 p.m. on September 7, 2020. The United States denies the remaining allegations in Paragraph 38.**

40. Despite the NWS's warnings and all the other information Defendants knew about the elevated risk of fire on Labor Day, and knowledge that other utilities had de-energized their power lines, all Defendants intentionally energized their lines until the time of the first ignition. If Defendants had de-energized their lines prior to that time, the Holiday Farm Fire would not have occurred. Likewise, if defendant United States had properly maintained vegetation near lines on its property, the Holiday Farm Fire would not have occurred.

**The allegations in the first two sentences of Paragraph 40 are vague, and the United States denies them on that basis. The United States denies the allegations in the last sentence of Paragraph 40. To the extent Plaintiffs seek to assert negligence against the United States based upon a failure to de-energize power lines, such claim is barred by the law of the case, as the Court has ruled that it lacks subject matter jurisdiction on those claims and has dismissed the claims with prejudice. See Order. 6:24-cv-00089, ECF No. 194.**

41. Following the first ignition, now knowing that under the extreme conditions there was a near certainty that their power lines would start a wildfire, Defendants intentionally re-energized

their power lines, thereby, along with the United States' and EWEB's failure to properly manage vegetation, causing the second and third ignitions.

**The United States denies the allegations in Paragraph 41. To the extent Plaintiffs seek to assert negligence against the United States based upon a failure to de-energize power lines, such claim is barred by the law of the case, as the Court has ruled that it lacks subject matter jurisdiction on those claims and has dismissed the claims with prejudice. See Order. 6:24-cv-00089, ECF No. 194.**

42. It was egregious for Defendants to continue to energize power lines on September 7th, even before the first ignition, because Defendants knew that their vegetation management programs on the land surrounding the power lines were inadequate. Indeed, Defendants' vegetation management policies and practices made it substantially certain that vegetation would fall against Defendants' power lines in high winds.

**The United States denies the allegations in Paragraph 42. To the extent Plaintiffs seek to assert negligence against the United States based upon a failure to de-energize power lines, such claim is barred by the law of the case, as the Court has ruled that it lacks subject matter jurisdiction on those claims and has dismissed the claims with prejudice. See Order. 6:24-cv-00089, ECF No. 194.**

43. The natural, ordinary, and predictable consequence of Defendants' intentional conduct—including continuing to energize power lines that they owned, operated, or controlled when there was extreme wildfire danger—led to their power lines falling and, shortly thereafter, starting the Holiday Farm Fire, which rapidly and predictably spread to Plaintiffs' properties.

**The United States denies the allegations in Paragraph 43. To the extent Plaintiffs seek to assert negligence against the United States based upon a failure to de-energize power lines, such claim is barred by the law of the case, as the Court has ruled that it lacks subject matter jurisdiction on those claims and has dismissed the claims with prejudice. See Order. 6:24-cv-00089, ECF No. 194.**

44. The Holiday Farm Fire eventually destroyed over 170,000 acres. It killed at least one person, injured countless others, and caused millions of dollars in property damage.

**In response to the allegations in Paragraph 44, the United States admits the Holiday Fire affected over 170,000 acres and caused property damage.**

**V. Defendants' actions predictably led to Plaintiffs' harm.**

45. Defendants knew that any fire started on September 7, 2020, would be almost impossible to contain due to conditions that were known or predicted, including strong, hot, dry winds; the wind direction and speed (including gusts reaching up to 50 miles per hour); the area's existing topography, geography, and ecological and drought conditions; high fuel loads; high energy release conditions; limited escape routes; limited access for firefighters and emergency personnel; and limited firefighting resources available due to fires elsewhere. These same conditions made it foreseeable that the wildfire that Defendants' power lines started would spread to Plaintiffs' properties and cause their property loss, given the close proximity of Plaintiffs' properties to the Holiday Farm fire ignition points and presence in the fire's burn area.

**The allegations in Paragraph 45 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 45.**

46. The inevitable consequence of the fire that Defendants' intentional decisions caused was that flames, smoke, embers, ash, odors, gases, and airborne particles came into contact with, were deposited on, damaged, destroyed, and/or otherwise trespassed on Plaintiffs' real and personal property, causing incredibly hazardous and unhealthy conditions, and interfering with Plaintiffs' right to enjoy their properties. This interference is ongoing, as Plaintiffs face an ongoing risk of harm to themselves and their property from rockfall, flooding, debris flows, diminished drinking water quality, decreased soil productivity, and increased noxious weed spread – all caused by the Holiday Farm Fire.

**The allegations in Paragraph 46 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 46.**

47. Another inevitable consequence of the fire that Defendants' intentional conduct caused was that many people, including Plaintiffs, who were in the area that the fire impacted suffered serious, ongoing personal injuries because of wildfire smoke, including harm to the heart, lungs, and other vital organs, and increased risk of stroke, heart attacks and respiratory problems.

**The allegations in Paragraph 47 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 47.**

48. The Holiday Farm Fire caused Plaintiffs to suffer substantial harm to their persons, interests, and property including, but not limited to, interference with their personal rights and interests in their use and quiet enjoyment of their real and personal properties; interference with their normal and usual activities; personal injuries including irritation of the eyes and respiratory tract, coughing, phlegm, wheezing, and difficulty breathing; fear for their lives and personal safety, mental suffering, emotional distress, stress, anxiety, annoyance and inconvenience; medical bills; increased risks of emergency room visits, hospital admissions, and premature death; horrific death of beloved pets and other animals; damage to and destruction of real property; damage to and loss of structures, personal property, and cherished possessions; out-of-pocket expenses directly incurred as a result of the fire; additional living expenses; evacuation expenses; uncompensated time engaged in recovery efforts; lost wages; loss of earning capacity; and loss of business income and goodwill.

**The United States lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 48 and therefore denies them.**

**FIRST CLAIM FOR RELIEF**

**Negligence**

**(Asserted by the FTCA Plaintiffs Against the United States Only)**

49. Paragraphs 1-47 are incorporated into this claim for relief.

**The United States incorporates its responses as if set forth herein.**

50. The provision of electrical power involves a peculiar and inherent risk of wildfire and requires the exercise of care and precaution commensurate with and proportionate to that

increased risk, so as to make the transport of electricity through an electric utility infrastructure safe under all circumstances and exigencies.

**The allegations in Paragraph 50 are vague, and the United States therefore denies them.**

51. The United States has special knowledge and expertise far beyond that of a layperson about the safe operation, maintenance, and repair of electric utility infrastructure including vegetation management efforts.

**The allegations in Paragraph 51 are vague, and the United States therefore denies them.**

52. Prior to and on September 7, 2020, the United States had a duty to apply a level of care commensurate with, and proportionate to, the inherent dangers in operating, maintaining, and repairing an electric utility infrastructure. This duty also required the United States to maintain a vegetation management program for the control of vegetation surrounding power lines on its land, and to comply with its own Transmission Vegetation Management Program.

**The United States admits that BPA follows agency and department guidelines; and that BPA performs vegetation management along its powerlines, including by removing trees and vegetation. The remaining allegations in Paragraph 52 contain legal conclusions to which no response if required. To the extent a response is required, the United States denies them.**

53. The United States' duty of care also required it to adhere to Good Utility Practice as defined in its Open Access Transmission Tariff, as follows: Any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Good Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather to be acceptable practices, methods, or acts generally accepted in the region, including those practices required by Federal Power Act Section 215(a)(4).

**Paragraph 53 purports to characterize the content of the Open Access Transmission Tariff. The OATT speaks for itself and is the best evidence of its contents. To the extent the allegations in Paragraph 53 are inconsistent with the referenced statements or otherwise taken out of context, the United States denies the allegations.**

54. The agreements pursuant to which the United States allowed EWEB to construct and operate power lines on Willamette National Forest land required the United States to independently take all reasonable and practicable precautions to prevent forest fires on that land, and granted the United States the express authority to require EWEB to clear vegetation or take any other precaution against fire. The United States' duty of care also required it to consider the changing conditions of its electric utility infrastructure, as well as changing geographic, weather, and ecological conditions, and to take special precautions to protect nearby properties from wildfires caused by its electric utility infrastructure and the electric utility infrastructure located on its land.

**The allegations in the first sentence of Paragraph 54 purport to characterize the agreements between EWEB and the United States. Those documents speak for themselves and are the best evidence of their content. To the extent the allegations in Paragraph 54 are inconsistent with the referenced statements or otherwise taken out of context, the United States denies the allegations. The allegations in the second sentence of Paragraph 54 are vague and state legal conclusions, and the United States therefore denies them.**

55. The United States breached its duties by, among other things: a. Operating and maintaining its electric utility infrastructure in a manner that was inadequate to withstand the foreseeable risk of wildfires;

b. Maintaining and inspecting vegetation within proximity to power lines on its land in a manner that did not adequately mitigate the foreseeable risk of fire;

c. Conducting inspections that were not sufficiently prompt, proper, or frequent to protect its electric utility infrastructure;

d. Re-energizing power lines it owned, operated or controlled, including the Cougar-Holden Creek Line, after a fault at approximately 5:25 p.m., on September 7, 2020, when the first ignition occurred;

e. Re-energizing its electric utility infrastructure after vegetation fell on its power lines;

f. Delaying inspection of its power lines after vegetation fell on them;

g. Providing inadequate training and supervision of employees and agents responsible for maintenance and inspection of its electric utility infrastructure; and/or

h. Choosing to delay implementation and compliance with regulations and reasonably prudent practices to avoid fire ignition.

**The allegations in Paragraph 55 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 55.**

56. In engaging in the conduct alleged in the preceding paragraphs, United States employees violated policies that they were required to follow, failed to adhere to objective standards of care, and negligently exercised their professional and scientific judgment.

**The allegations in Paragraph 56 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 56.**

57. The United States knew of the extreme fire danger immediately before September 7, 2020, and it breached its duty of reasonable care to the FTCA Plaintiffs by acting unreasonably in light of that knowledge. The Holiday Farm Fire was a direct and legal result of the United States' breach of its duties of reasonable care to the FTCA Plaintiffs.

**The allegations in Paragraph 57 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 57.**

58. The United States acted intentionally with indifference to the probable and foreseeable consequences of its acts and omissions. Its negligence caused the Holiday Farm Fire and was a substantial factor in causing the FTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

**The allegations in Paragraph 58 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 58.**

59. The FTCA Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. The FTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

**The United States denies the allegations contained in Paragraph 59 and affirmatively asserts that damages are limited to those allowed under the Federal Tort Claims Act, 28 U.S.C. 1346(b), 2671-2680.**

**SECOND CLAIM FOR RELIEF**

**Negligence *Per Se***

**(Asserted by the FTCA Plaintiffs Against the United States Only)**

60. Paragraphs 1-58 are incorporated into this claim for relief.

**The United States incorporates its responses as if set forth herein.**

61. The United States had a special relationship with the FTCA Plaintiffs that created a special duty to the FCTA Plaintiffs. This special relationship arose out of, among other things, Oregon statutes and regulations regulating utilities. Oregon law required the United States to extinguish any fire it accidentally started in any forestland, or any place from which fire may be transmitted to forestland, or to use every effort to do so; and to not carelessly or through neglect permit a fire caused on or near forestland to spread to or through forestland. ORS 477.720.

**The allegations in Paragraph 61 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies it had any "special duty" to plaintiffs and states it can be liable only as set forth in the Federal Tort Claims Act, 28 U.S.C. 1346(b), 2671-2680.**

62. Oregon law also required the United States, among other things, to:

a. "[C]onstruct, operate, and maintain electrical supply . . . lines in compliance with the standards prescribed by the 2017 Edition of the National Electricity Safety Code approved April 26, 2016, by the American National Standards Institutes." OAR 860-024-0010.

b. "Construct, operate, and maintain" facilities in compliance with safety rules promulgated by the PUC. OAR 860-024-0011(1)(a); and

c. "Perform routine safety patrols of overhead electric supply lines and accessible facilities for hazards to the public" at least every two years. OAR 860-024-0011(2).

**The allegations in Paragraph 62 state legal conclusions that do not require a response.**

63. Additional regulations applicable to the United States included, without limitation, the requirement that the United States "trim or remove vegetation to maintain clearances from electric supply conductors" to include maintaining "[u]nder reasonably anticipated operational conditions" at least ten feet clearance of vegetation for conductors energized above 200,000 volts; at least 7.5 feet clearance of vegetation for conductors energized at between 50,001 and 200,000 volts; and at least 5 feet clearance of vegetation for conductors energized at between 600 and 50,000 volts (or 3 feet if the vegetation is not readily climbable). OAR 860-024-0016(5).

**The allegations in Paragraph 63 state legal conclusions that do not require a response.**

64. Through its conduct described herein, the United States violated the statutes and regulations set forth above.

**The allegations in Paragraph 64 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 64.**

65. The statutes and regulations that the United States violated are intended to prevent the exact type of harm that Plaintiffs suffered. The United States' noncompliance with the statutes and regulations specified above directly, legally, and proximately resulted in the Holiday Farm Fire, and was a substantial factor in causing Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

**The allegations in Paragraph 65 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 65.**

66. The FTCA Plaintiffs each seek damages on an individual basis as shall be proven at trial. The FTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

**The first sentence of Paragraph 66 is a characterization of the lawsuit that does not require a response. In response to the second sentence of Paragraph 66, the United States denies that plaintiffs are entitled to any recovery and denies that plaintiffs could seek double damages.**

**THIRD CLAIM FOR RELIEF**

**Trespass**

**(Asserted by the FTCA Plaintiffs Against the United States Only)**

67. Paragraphs 1-65 are incorporated into this claim for relief.

**The United States incorporates its responses as if set forth herein.**

68. On September 7, 2020, the FTCA Plaintiffs were the owners, tenants, or lawful occupiers of real properties in the Holiday Farm area of Oregon. The FTCA Plaintiffs' possessory interests in their properties was exclusive.

**The United States lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 68 and therefore denies them.**

69. The United States negligently, recklessly, and/or intentionally took action that caused the Holiday Farm Fire to ignite, resulting in a fire that spread out of control, which harmed the FTCA Plaintiffs' persons, interests, and properties. Flames, smoke, embers, ash, odors, gases, and airborne particles came into contact with, were deposited on, damaged, destroyed, and/or otherwise trespassed on the FTCA Plaintiffs' real and personal property.

**The allegations in Paragraph 69 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 69.**

70. The United States knew that a trespass would result from its actions. The United States' actions in setting in motion the unauthorized entry and trespass were undertaken knowing that a trespass would result, and a trespass resulted from those actions.

**The allegations in Paragraph 70 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 70.**

71. The FTCA Plaintiffs did not grant permission for any fire to enter their properties.

**The United States lacks knowledge or information sufficient to admit or deny the allegations in paragraph 71 and therefore denies them.**

72. This trespass was a substantial factor in causing the FTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

**The allegations in Paragraph 72 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 72.**

73. The FTCA Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. The FTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

**The first sentence of Paragraph 73 is a characterization of the lawsuit that does not require a response. In response to the second sentence of Paragraph 73, the United States denies that plaintiffs are entitled to any recovery and denies that plaintiffs could seek double damages.**

## FOURTH CLAIM FOR RELIEF

### Nuisance

**(Asserted by the FTCA Plaintiffs Against the United States Only)**

74. Paragraphs 1-72 are incorporated into this claim for relief.

**The United States incorporates its responses as if set forth herein.**

75. On September 7, 2020, the FTCA Plaintiffs were the owners, tenants, and/or lawful occupiers of real properties in the area to which the Holiday Farm Fire spread. The FTCA Plaintiffs had a possessory interest in real property that the Holiday Farm Fire damaged and destroyed, including the right to quiet use and enjoyment.

**United States lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 75 and therefore denies them.**

76. The United States owned, maintained, controlled, and/or operated the electric utility infrastructure, and/or the vegetation, that caused the Holiday Farm Fire, including the First and Second Ignitions that rapidly spread out of control.

**The allegations in Paragraph 76 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 76.**

77. The United States' negligent, reckless, and/or intentional actions with respect to its electric utility infrastructure and vegetation, as described above, created conditions and/or permitted conditions to exist that (a) were harmful to health; (b) offended the senses; (c) obstructed the free use of property, so as to substantially interfere with the comfortable enjoyment of life and property; and (d) unlawfully obstructed the free passage or use, in the customary manner, of public streets and highways.

**The allegations in Paragraph 77 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 77.**

78. These conditions, including flames, smoke, embers, ash, odors, gases, and airborne particles, interfered with the FTCA Plaintiffs' right to quiet enjoyment of their properties in a way unique to each Plaintiff.

**The United States lacks information or belief sufficient to admit or deny the allegations in Paragraph 78 and therefore denies them.**

79. These conditions affected a substantial number of people at the same time.

**The allegations in Paragraph 79 are vague, and the United States therefore denies them.**

80. At no time did the FTCA Plaintiffs consent to the United States' actions in creating these conditions.

**Paragraph 80 is vague and the United States therefore denies it.**

81. An ordinary person would be reasonably annoyed and disturbed by the United States' actions that created these conditions.

**The allegations in Paragraph 81 state legal conclusions, to which no response is required. To the extent a response is required, Paragraph 81 is vague and the United States therefore denies it.**

82. The United States' actions in creating these conditions were a substantial factor in causing the FTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

**The allegations in Paragraph 82 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 82.**

83. The United States' negligence, recklessness, and/or intentional behavior substantially and unreasonably interfered with the FTCA Plaintiffs' use and enjoyment of their real and personal property.

**The allegations in Paragraph 83 state legal conclusions, to which no response is required. To the extent a response is required, the United States denies the allegations in Paragraph 83.**

84. The harms caused by the United States were unique to each FCTA Plaintiff and different from damages suffered by other FTCA Plaintiffs and from the general public.

**The allegations in Paragraph 84 state legal conclusions, to which no response is required. To the extent a response is required, Paragraph 84 is vague and the United States therefore denies it.**

85. Whatever benefit to the United States its behavior may have provided was outweighed by the harm its operations imposed on the FTCA Plaintiffs.

**Paragraph 85 is vague and the United States therefore denies it.**

86. The FTCA Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. The FTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

**The first sentence of Paragraph 86 is a characterization of the lawsuit that does not require a response. In response to the second sentence of Paragraph 86, the United States denies that plaintiffs are entitled to any recovery and denies that plaintiffs could seek double damages.**

**FIFTH CLAIM FOR RELIEF**

**Negligence**

**(Asserted by All Plaintiffs Against LEC Only)**

87. Paragraphs 1-47 are incorporated into this claim for relief.

**This claim is directed at LEC and does not require a response by the United States.**

88. Electricity is a dangerous instrumentality that poses an inherent risk to people and property. The provision of electrical services involves a peculiar and inherent risk of wildfire and requires the exercise of care and precaution commensurate with and proportionate to that increased risk, so as to make the transport of electricity through an electric utility infrastructure safe under all circumstances and exigencies.

**This claim is directed at LEC and does not require a response by the United States.**

89. LEC has special knowledge and expertise far beyond that of a layperson about the safe operation, maintenance, and repair of electric utility infrastructure including vegetation management efforts.

**This claim is directed at LEC and does not require a response by the United States.**

90. Prior to and on September 7, 2020, LEC had a duty to apply a level of care commensurate with, and proportionate to, the inherent dangers in operating, maintaining, and repairing an electric utility infrastructure. This duty also required LEC to maintain appropriate vegetation management programs for the control of vegetation surrounding LEC's exposed power lines. This duty also required LEC to consider the changing conditions of its electric utility infrastructure, as well as changing geographic, weather, and ecological conditions. This duty also required LEC to take special precautions to protect nearby properties from wildfires caused by LEC's electric utility infrastructure.

**This claim is directed at LEC and does not require a response by the United States.**

91. LEC breached its duties by, among other things:

a. Operating and maintaining its electric utility infrastructure in a manner that was inadequate to withstand the foreseeable risk of wildfires;

b. Conducting inspections that were not sufficiently prompt, proper, or frequent to protect its electric utility infrastructure;

c. Continuing to energize its power lines despite the extreme fire risk on the evening of September 7, 2020;

d. Continuing to energize its power lines after a fault occurred on a BPA line at approximately 5:25 p.m. on September 7, 2020, without first determining the cause of the fault and evaluating the risk associated with continuing to energize its power lines;

e. Designing its electric utility infrastructure so that its power lines crossed under EWEB's power lines without adequate clearance between its and EWEB's power lines.

f. Taking inadequate precautions to assure that EWEB's power lines did not sag and were sufficiently clear of vegetation to prevent the risk of contact with its power lines;

g. Delaying inspection of its power lines after they came in contact with EWEB's power lines;

h. Providing inadequate training and supervision of employees and agents responsible for maintenance and inspection of its electric utility infrastructure; and/or

i. Choosing to delay implementation and compliance with regulations and reasonably prudent practices to avoid fire ignition.

**This claim is directed at LEC and does not require a response by the United States.**

92. LEC knew of the extreme fire danger that the conditions on and immediately before September 7, 2020, created, and it breached its duty of reasonable care to Plaintiffs by acting unreasonably in light of that knowledge. The Holiday Farm Fire was a direct and legal result of LEC's breach of its duties of reasonable care to Plaintiffs.

**This claim is directed at LEC and does not require a response by the United States.**

93. LEC acted with indifference to the probable and foreseeable consequences of its acts. Its negligence caused the Holiday Farm Fire and was a substantial factor in causing Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

**This claim is directed at LEC and does not require a response by the United States.**

94. Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

**This claim is directed at LEC and does not require a response by the United States.**

**SIXTH CLAIM FOR RELIEF**

**Trespass**

**(Asserted by All Plaintiffs Against LEC Only)**

95. Paragraphs 1-47 and 86-93 are incorporated into this claim for relief.

**This claim is directed at LEC and does not require a response by the United States.**

96. On September 7, 2020, Plaintiffs were the owners, tenants, or lawful occupiers of real properties in the Holiday Farm area of Oregon. Plaintiffs' possessory interests in their properties was exclusive.

**This claim is directed at LEC and does not require a response by the United States.**

97. LEC negligently, recklessly, and/or intentionally allowed fire to ignite and/or spread out of control, which harmed Plaintiffs' persons, interests, and properties. Flames, smoke, embers, ash, odors, gases, and airborne particles came into contact with, were deposited on, damaged, destroyed, and/or otherwise trespassed on Plaintiffs' real and personal property.

**This claim is directed at LEC and does not require a response by the United States.**

98. LEC's actions in setting in motion the unauthorized entry and trespass were undertaken knowing that a trespass would result, and a trespass resulted from those actions.

**This claim is directed at LEC and does not require a response by the United States.**

99. Plaintiffs did not grant permission for any fire to enter their properties.

**This claim is directed at LEC and does not require a response by the United States.**

100. This trespass was a substantial factor in causing Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

**This claim is directed at LEC and does not require a response by the United States.**

101. Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

**This claim is directed at LEC and does not require a response by the United States.**

**SEVENTH CLAIM FOR RELIEF**

**Nuisance**

**(Asserted by All Plaintiffs Against LEC Only)**

102. Paragraphs 1-47 and 86-100 are incorporated into this claim for relief.

**This claim is directed at LEC and does not require a response by the United States.**

103. On September 7, 2020, Plaintiffs were the owners, tenants, and/or lawful occupiers of real properties in the area to which the Holiday Farm Fire spread. Plaintiffs had a possessory interest in real property that the Holiday Farm Fire damaged and destroyed, including the right to quiet use and enjoyment.

**This claim is directed at LEC and does not require a response by the United States.**

104. LEC owned, maintained, controlled, and/or operated the electric utility infrastructure that caused the Holiday Farm Fire.

**This claim is directed at LEC and does not require a response by the United States.**

105. LEC's negligent, reckless, and/or intentional actions with respect to its electric utility infrastructure created conditions and/or permitted conditions to exist that (a) were harmful to health; (b) offended the senses; (c) obstructed the free use of property, so as to substantially interfere with the comfortable enjoyment of life and property; and (d) obstructed the free passage or use, in the customary manner, of public streets and highways.

**This claim is directed at LEC and does not require a response by the United States.**

106. These conditions, including flames, smoke, embers, ash, odors, gases, and airborne particles, interfered with Plaintiffs' right to quiet enjoyment of their properties in a way unique to each Plaintiff.

**This claim is directed at LEC and does not require a response by the United States.**

107. These conditions affected a substantial number of people at the same time.

**This claim is directed at LEC and does not require a response by the United States.**

108. At no time did Plaintiffs consent to LEC's actions in creating these conditions.

**This claim is directed at LEC and does not require a response by the United States.**

109. An ordinary person would be reasonably annoyed and disturbed by LEC's actions in creating these conditions.

**This claim is directed at LEC and does not require a response by the United States.**

110. LEC realized or should have realized that the objectionable condition posed an unreasonable risk of fire that could spread and cause harm to Plaintiffs' persons, interests, and property.

**This claim is directed at LEC and does not require a response by the United States.**

111. LEC could have fully eliminated the risk of fire, at little or no cost, by deenergizing its power lines during extremely dangerous conditions, and its decision not to do so was negligent, reckless, and/or intentional.

**This claim is directed at LEC and does not require a response by the United States.**

112. LEC's actions in creating these conditions were a substantial factor in causing Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

**This claim is directed at LEC and does not require a response by the United States.**

113. LEC's negligence, recklessness, and/or intentional behavior substantially and unreasonably interfered with Plaintiffs' use and enjoyment of their real and personal property.

**This claim is directed at LEC and does not require a response by the United States.**

114. The harms caused by LEC were unique to each Plaintiff and different from damages suffered by other Plaintiffs and from the general public.

**This claim is directed at LEC and does not require a response by the United States.**

115. Whatever benefit LEC realized by its behavior was outweighed by the harm its operations imposed on Plaintiffs.

**This claim is directed at LEC and does not require a response by the United States.**

116. Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

**This claim is directed at LEC and does not require a response by the United States.**

## EIGHTH CLAIM FOR RELIEF

### Negligence

### (Asserted by the OTCA Plaintiffs Against EWEB Only)

117. Paragraphs 1-47 are incorporated into this claim for relief.

**This claim is directed at EWEB and does not require a response by the United States.**

118. Electricity is a dangerous instrumentality that poses an inherent risk to people and property. The provision of electrical services involves a peculiar and inherent risk of wildfire and requires the exercise of care and precaution commensurate with and proportionate to that increased risk, so as to make the transport of electricity through an electric utility infrastructure safe under all circumstances and exigencies.

**This claim is directed at EWEB and does not require a response by the United States.**

119. EWEB has special knowledge and expertise far beyond that of a layperson about the safe operation, maintenance, and repair of electric utility infrastructure including vegetation management efforts.

**This claim is directed at EWEB and does not require a response by the United States.**

120. Prior to and on September 7, 2020, EWEB had a duty to apply a level of care commensurate with, and proportionate to, the inherent dangers in operating, maintaining, and repairing an electric utility infrastructure. This duty also required EWEB to maintain appropriate vegetation management programs for the control of vegetation surrounding EWEB's exposed

power lines. This duty also required EWEB to consider the changing conditions of its electric utility infrastructure, as well as changing geographic, weather, and ecological conditions. This duty also required EWEB to take special precautions to protect nearby properties from wildfires caused by EWEB's electric utility infrastructure.

**This claim is directed at EWEB and does not require a response by the United States.**

121. EWEB breached its duties by, among other things:

a. Operating and maintaining the electric utility infrastructure it owned and/or operated in a manner that was inadequate to withstand the foreseeable risk of wildfires;

b. Maintaining and inspecting vegetation within proximity of its energized power lines in a manner that did not adequately mitigate the foreseeable risk of fire;

c. Conducting inspections that were not sufficiently prompt, proper, or frequent to protect its electric utility infrastructure;

d. Keeping breakers closed during extremely dangerous wildfire conditions;

e. Keeping breakers set on automatic reclose during extremely dangerous wildfire conditions;

f. Energizing the power lines it owned and/or operated despite the extreme fire risk on the evening of September 7, 2020;

g. Designing its electric utility infrastructure so that its power lines crossed over LEC's power lines without adequate clearance between its power lines and LEC's power lines;

h. Designing or allowing its power lines to have insufficient tension, resulting in the power lines sagging and thereby creating a risk of contact with LEC's power lines;

i. Delaying inspection of its power lines after they came in contact with LEC's power lines;

j. Delaying notification to first responders that its and LEC's power lines were de-energized and that it was safe to engage in fire suppression activities;

k. Providing inadequate training and supervision of employees and agents responsible for maintenance and inspection of its electric utility infrastructure; and/or

l. Choosing to delay implementation and compliance with regulations and reasonably prudent practices to avoid fire ignition.

**This claim is directed at EWEB and does not require a response by the United States.**

122. EWEB knew of the extreme fire danger that the conditions immediately before September 7, 2020, created, and it breached its duty of reasonable care to the OTCA Plaintiffs by acting unreasonably in light of that knowledge. As a result of EWEB's breaches of duty, one or more trees fell on its power line, causing its line to contact LEC's line, creating an arc or otherwise energizing its line, and thereby causing the second ignition which spread rapidly out of control. In addition, as a result of EWEB's breaches of duty, the Cougar-Holden Line was energized at the time of the first ignition, and the LEC lines were energized at the time of the second ignition, thereby causing both of those ignitions, and the third one. Consequently, the Holiday Farm Fire was a direct and legal result of EWEB's breach of its duties of reasonable care to the OTCA
Plaintiffs.

**This claim is directed at EWEB and does not require a response by the United States.**

123. EWEB acted with indifference to the probable and foreseeable consequences of its acts. Its negligence caused the Holiday Farm Fire and was a substantial factor in causing the OTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

**This claim is directed at EWEB and does not require a response by the United States.**

124. The OTCA Plaintiffs each seek damages on an individual basis as shall be proven at trial. The OTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

**This claim is directed at EWEB and does not require a response by the United States.**

## NINTH CLAIM FOR RELIEF

### Trespass

### (Asserted by the OTCA Plaintiffs Against EWEB Only)

125. Paragraphs 1-47 and 116-123 are incorporated into this claim for relief.

**This claim is directed at EWEB and does not require a response by the United States.**

126. On September 7, 2020, the OTCA Plaintiffs were the owners, tenants, or lawful occupiers of real properties in the Holiday Farm area of Oregon. The OTCA Plaintiffs' possessory interests in their properties was exclusive.

**This claim is directed at EWEB and does not require a response by the United States.**

127. EWEB negligently, recklessly, and/or intentionally allowed fire to ignite and/or spread out of control, which damaged the OTCA Plaintiffs' persons, interests, and properties. Flames, smoke, embers, ash, odors, gases, and airborne particles came into contact with, were deposited on, damaged, destroyed, and/or otherwise trespassed on the OTCA Plaintiffs' real and personal property.

**This claim is directed at EWEB and does not require a response by the United States.**

128. EWEB knew that a trespass would result from its actions. EWEB's actions in setting in motion the unauthorized entry and trespass were undertaken knowing that a trespass would result, and a trespass resulted from those actions and inactions.

**This claim is directed at EWEB and does not require a response by the United States.**

129. The OTCA Plaintiffs did not grant permission for any fire to enter their properties.

**This claim is directed at EWEB and does not require a response by the United States.**

130. This trespass was a substantial factor in causing the OTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

**This claim is directed at EWEB and does not require a response by the United States.**

131. The OTCA Plaintiffs each seek damages on an individual basis as shall be proven at trial. The OTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

**This claim is directed at EWEB and does not require a response by the United States.**

**TENTH CLAIM FOR RELIEF**

**Nuisance**

**(Asserted by OTCA Plaintiffs Against EWEB Only)**

132. Paragraphs 1-47 and 116-130 are incorporated into this claim for relief.

**This claim is directed at EWEB and does not require a response by the United States.**

133. On September 7, 2020, the OTCA Plaintiffs were the owners, tenants, and/or lawful occupiers of real properties in the area to which the Holiday Farm Fire spread. The OTCA Plaintiffs had a possessory interest in real property that the Holiday Farm Fire damaged and destroyed, including the right to quiet use and enjoyment.

**This claim is directed at EWEB and does not require a response by the United States.**

134. EWEB owned, maintained, controlled, and/or operated the electric utility infrastructure that caused the Holiday Farm Fire.

**This claim is directed at EWEB and does not require a response by the United States.**

135. EWEB's negligent, reckless, and/or intentional actions with respect to the electric utility infrastructure it owned, maintained, controlled, and/or operated, as described above, created conditions and/or permitted conditions to exist that (a) were harmful to health; (b) offended the senses; (c) obstructed the free use of property, so as to substantially interfere with the comfortable enjoyment of life and property; and (d) unlawfully obstructed the free passage or use, in the customary manner, of public streets and highways.

**This claim is directed at EWEB and does not require a response by the United States.**

136. These conditions, including flames, smoke, embers, ash, odors, gases, and airborne particles, interfered with the OTCA Plaintiffs' right to quiet enjoyment of their properties in a way unique to each Plaintiff.

**This claim is directed at EWEB and does not require a response by the United States.**

137. These conditions affected a substantial number of people at the same time.

**This claim is directed at EWEB and does not require a response by the United States.**

138. At no time did the OTCA Plaintiffs consent to EWEB's actions that created these conditions.

**This claim is directed at EWEB and does not require a response by the United States.**

139. An ordinary person would be reasonably annoyed and disturbed by EWEB's actions in creating these conditions.

**This claim is directed at EWEB and does not require a response by the United States.**

140. EWEB's actions in creating these conditions were a substantial factor in causing the OTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

**This claim is directed at EWEB and does not require a response by the United States.**

141. EWEB's negligence, recklessness, and/or intentional behavior substantially and unreasonably interfered with the OTCA Plaintiffs' use and enjoyment of their real and personal property.

**This claim is directed at EWEB and does not require a response by the United States.**

142. The harms caused by BPA were unique to each OTCA Plaintiff and different from damages suffered by the other OTCA Plaintiffs and from the general public.

**This claim is directed at EWEB and does not require a response by the United States.**

143. Whatever benefit EWEB realized by its behavior is outweighed by the harm its operations imposed on the OTCA Plaintiffs.

**This claim is directed at EWEB and does not require a response by the United States.**

144. The OTCA Plaintiffs each seek damages on an individual basis as shall be proven at trial. The OTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

**This claim is directed at EWEB and does not require a response by the United States.**

## PRAYER FOR RELIEF

Plaintiffs seek:

(a) Damages on an individual basis in amounts as shall be proven at trial;

(b) Reasonable attorney's fees and costs to the extent permitted under ORCP 68B;

(c) Twice the amount of their economic and property damages, to the extent permitted under ORS 477.089(2)(b); and

(d) Any other relief as the Court shall deem proper, all according to proof.

**The United States denies that plaintiffs are entitled to any recovery from the United States.**

## JURY TRIAL REQUEST

Plaintiffs request a jury trial on all claims for relief for which a jury trial is available under the law.

**The United States denies Plaintiffs are entitled to a jury trial under the Federal Tort Claims Act.**

**AFFIRMATIVE DEFENSES**

1. Plaintiffs' claims are barred to the extent that they are based on the exercise or performance or failure to exercise or perform a discretionary function or duty. 28 U.S.C. 2680(a).

2. Plaintiffs' claims are barred by any exception to or limitation on the United States' waiver of sovereign immunity.

3. If any liability is attributed to the United States, it is limited to the United States' proportionate share of the fault. The United States' liability, if any, must be apportioned and allocated in proportion to the respective fault of all parties whose conduct proximately caused and contributed to any such damage in accordance with ORS §§ 31.600, 31.800.

4. Plaintiffs may not recover amounts in excess of those indicated in an administrative claim timely filed with the relevant agency.

5. The United States, through its employees or agencies, did not owe a legal duty to Plaintiffs.

6. No acts or omissions of the United States, through its employees or agencies, were the proximate cause of any injury to Plaintiffs. Plaintiffs' damages were proximately caused by the acts or omissions of third parties over whom the United States has no control. Further, Plaintiffs' damages may have been caused by power lines or forces of nature for which the United States is not liable. Moreover, Plaintiffs' harms were not foreseeable to the United States, and no act or omission of the United States was a substantial factor in Plaintiffs' harms.

7. Plaintiffs' recovery of damages, if any, is limited by Federal and applicable state law.

8. Plaintiffs failed to mitigate their damages and are barred from recovering any such damages that could /should have been mitigated.

9. Plaintiffs may not recover punitive damages, non-monetary damages, or pre-judgment interest under the Federal Tort Claims Act. 28 U.S.C. § 2674.

10. To the extent the Court enters a money judgment against the United States, Plaintiffs are entitled to post-judgment interest only in accordance with the provisions of 28 U.S.C. § 1961(b) and 31 U.S.C. § 1304(b).

11. Plaintiffs' claims are time-barred to the extent they failed to file an administrative claim with the relevant agency within two years.

12. Negligence claims based upon the United States' failure to de-energize power lines are barred under the law of the case, as the Court has ruled that it lacks subject matter jurisdiction on those claims and has dismissed the claims with prejudice. See Order. 6:24-cv-00089, ECF No. 194.

13. The United States asserts that it has, or may have, additional affirmative defenses that are not known to the United States at this time but may be ascertained through discovery. The United States specifically preserves these and other affirmative defenses as may be ascertained through discovery.

**WHEREFORE**, having fully answered all counts of the Allard's First Amended Complaint, Defendant United States prays that Plaintiffs Allard take nothing by way of their Answer, that the same be dismissed, and that judgment be awarded in favor of United States, together with costs and such other and further relief as the Court deems appropriate in this case.

Dated: July 9, 2026.

SCOTT E. BRADFORD
United States Attorney
District of Oregon

PHILIP D. MACWILLIAMS
Director, Torts Branch

GRANT E. TREASTER
Assistant Director, Torts Branch

/s/ *Susanne Luse*
SUSANNE LUSE
Assistant United States Attorney
Assistant United States Attorney
Susanne.Luse@usdoj.gov
United States Attorney's Office
District of Oregon
1000 SW Third Ave., Suite 600
Portland, Oregon 97204
Telephone: (503) 727-1000

ARI NAZAROV
Trial Attorney
JOCELYN KRIEGER
Trial Attorney
BRENT M. PHIPPS
Trial Attorney
*Attorneys for Defendant United States of America*